**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**PAPE BROADCASTING COMPANY (Radio Station WALA) and Local Union No. 1264, Radio Broadcast Technicians, International Brotherhood of Electrical Workers, AFL, Respondents.**

No. 14944.

United States Court of Appeals
Fifth Circuit.

Dec. 2, 1954.

As Modified on Denial of Rehearing
Jan. 28, 1955.

198

David P. Findling, Assoc. Gen. Counsel, N. L. R. B., A. Norman Somers, Asst. Gen. Counsel, N. L. R. B., Marcel Mallet-Prevost, Asst. Gen. Counsel, N. L. R. B., George J. Bott, General Counsel, John E. Jay, Attorneys, National Labor Relations Board, Elizabeth W. Weston, Atty., N. L. R. B., Washington, D. C., for petitioner.

Thomas E. Twitty, Mobile, Ala., Thomas S. Adair, J. R. Goldthwaite, Jr., Atlanta, Ga., Adair & Goldthwaite, Atlanta, Ga., for respondents Local Union 1264, I. B. E. W.

Inge, Twitty, Armbrecht & Jackson, Mobile, Ala., for respondent Pape Broadcasting Co.

Before BORAH, RIVES and TUTTLE, Circuit Judges.

TUTTLE, Circuit Judge.

This is a petition of the National Labor Relations Board for enforcement of

its order of April 13, 1953, 104 N.L.R.B. No. 2, against the respondents, based upon findings that respondent Local 1264 violated Sections 8(b) (1) (A) and 8(b) (2) of the Labor Management Relations Act, 29 U.S.C.A. §§ 158(b) (1) (A) and 158(b) (2), by causing respondent Company to discharge John A. Thompson for a reason other than failure to tender union dues and initiation fees, namely, his failure to surrender his membership in another IBEW Local; and that the Company violated Sections 8(a) (1) and 8(a) (3), 29 U.S.C.A. §§ 158(a) (1) and 158(a) (3), by discharging Thompson when it had reasonable grounds to believe that Local 1264 sought his discharge for a reason other than failure to tender initiation fees and dues to that union. The order sought to be enforced directed that the Company reinstate Thompson, that Local 1264 withdraw any objections thereto, that both respondents cease and desist from committing the above unfair labor practices, that both respondents jointly and severally make Thompson whole for the loss of pay suffered by him, that certain notices be posted, and that various records be made available and reports of compliance be submitted to the Board.

■ The Court has jurisdiction over this proceeding under Section 10(e) of the Act, 29 U.S.C.A. § 160(e) since the Company is engaged in interstate commerce and the acts found to constitute unfair labor practices occurred in Mobile, Alabama, within this Circuit.

■ We consider it unnecessary to recount or to comment at length upon the evidence of the unfair labor practices by Local 1264, being satisfied that upon the record as a whole there is substantial evidence to support the Board's findings of fact with respect thereto. An employee is entitled to job protection against the union under Section 8(b) (2) if he does nothing more than to tender the periodic dues and initiation fees uniformly required as a condition of ac-quiring or retaining membership in the union. Radio Officers' Union of Commercial Telegraphers Union, A. F. L. v. N. L. R. B., 347 U.S. 17, 74 S.Ct. 323; Union Starch & Refining Co. v. N. L. R. B., 7 Cir., 186 F.2d 1008, 27 A.L.R.2d 629, certiorari denied 342 U.S. 815, 72 S.Ct. 30, 96 L.Ed. 617. There is ample evidence in the record that Thompson made an actual tender of initiation fees and dues within a thirty-day extension voluntarily given by the local and that this tender was refused by the union;[1] and that even if the tender had been formally defective, the requirement of tender was excused entirely as the Board found, by the union's affirmative obstructive conduct, as in N. L. R. B. v. International Association of Machinists, 9 Cir., 203 F.2d 173. But even should we *disregard* this evidence with respect to Thompson's several efforts to pay dues, there is substantial evidence in the record showing that the true reason for the union's request for Thompson's discharge was his reluctance to give up membership in another local of the IBEW and the hostility created in Local 1264's members by that reluctance, once he had bowed to union pressure and given up his other membership. This conclusion of fact alone would be sufficient to sustain the Board's order against the union. Special Machine & Engineering Co., 109 N.L.R.B. No. 125. Respondents' argument that the union can, during a period of "grace" accorded by it in addition to the thirty day period for employees to tender dues to the labor organization under Section 8(a) (3), 29 U.S.C.A. § 158(a) (3), impose a condition (giving up membership in a sister local) *besides* tender of dues and initiation fees, upon the right of an employee not to be discriminated against in tenure of employment, is without merit. Under no circumstances does the Act permit union security agreements to be invoked to enforce any union rule besides simply the payment of dues and initiation fees. Radio Officers' Union of Commercial

---

1. The objection that legal tender was not used not having been made, it was waived by the union.

Telegraphers Union, A. F. L. v. N. L. R. B., supra.

Whether the Pape Broadcasting Company is shown by substantial evidence on the record considered as a whole to have been guilty of unfair labor practices involves in addition to substantial evidence of Thompson's discharge for failure to become a member of the union, also substantial evidence that the Company had *reasonable grounds to believe* that Thompson was denied membership for a reason other than failure to tender dues and initiation fees. We do not believe the record. considered as a whole shows substantial evidence of this latter element.

The Trial Examiner concluded, and the Board adopted as its conclusions on this issue, as follows:

"As hereinabove found, Respondent Station WALA was given every assurance by Respondent Local Union 1264 that its request for Thompson's discharge was strictly in accordance with law and with its union-security agreement. In addition it diligently investigated the request for discharge in its attempt to get to the bottom of the Thompson case. It is precisely these facts which impel a finding that Respondent Station WALA violated the Act. Martin [General Manager of the Company] admittedly was told in his conversation with Bailey and Bell on September 22, that Thompson could achieve membership in good standing in Respondent Local Union 1264 by depositing a valid traveling card and it was because of his failure to meet this condition that his termination was being pressed by Respondent Local Union 1264. Martin also admitted that Thompson told him on September 19, that he had previously tendered initiation fees and dues to Respondent Local Union 1264. With full knowledge of these facts (Martin also received copies of practically all the correspondence between Respondent Local Union 1264 and Thompson), Respondent Station WALA acceded to the request for Thompson's discharge. While it is true as counsel for Respondent Station WALA points out in his brief, that under the circumstances in which it found itself, 'the employer had to take hold of one horn of the dilemma' unfortunately in so doing it committed an unfair labor practice. Cf. Westinghouse Electric Corporation, [96 N.L.R.B. 71].

"Upon the whole record, I am constrained to find that Respondent Station WALA discharged Thompson on September 22, 1951, because he was not a member of Respondent Local Union 1264. As Respondent Station WALA knew that Thompson tendered the periodic dues and initiation fee uniformly required as a condition of membership without being accorded membership, I find that Respondent Station WALA discriminated in regard to hire or tenure of employment to encourage membership in Respondent Local Union 1264 in violation of Section 8(a)(3) of the Act and thereby interfered with, restrained, or coerced employees in the exercise of the rights guaranteed in Section 7 in violation of Section 9(a)(1)."

▇ These paragraphs fairly sum up the evidence supporting the inference that the Company committed unfair labor practices; they do not, however, mention certain other evidence tending to negative that inference. If there were no other, no doubt the evidence summed up above would constitute substantial evidence supporting the Board's conclusion of fact. But we are under a twofold duty to look to the entire record and to pass beyond these evidentiary facts; first, because the Act, 29 U.S.C.A. § 160(e), requires us to consider the record as a whole, and second, because we take cognizance of the obvious truth that in forming beliefs reasonable men do in fact consider all the information avail-

able, and that in consequence, "reasonable grounds to believe" may not be inferred from *isolated* facts but on the contrary must consist of *all* the conflicting evidence available to the person sought to be charged with the belief, which furthermore must be sufficient for a reasonable man to form a belief upon evaluation thereof.

In the first place, the Trial Examiner's statement quoted above that "Martin admittedly was told in his conversation with Bailey and Bell on September 22, that Thompson could achieve membership in good standing in * * * Local Union 1264 by depositing a valid traveling card and it was because of his failure to meet this condition that his termination was being pressed" is hardly in accordance with the testimony, or at most tells only half the story. Bell, President of Local 1264, testified as follows on cross-examination:

"Q. Didn't you tell Mr. Martin on that occasion [September 19]— you and Mr. Bailey—that [Thompson] had not tendered the necessary dues? A. Words to that effect.

* * * * *

"Q. Did Mr. Martin on [September 22, the day of Thompson's discharge] ask you if Mr. Thompson had tendered any dues to the Local? A. I don't know that he asked that particular question, but he did again attempt to establish whether or not the man had attempted to obtain membership in Local 1264."

Bailey, Business Agent of the Local, testified as follows on cross-examination:

"Q. * * * What transpired at that meeting [of September 19?] A. It was a very brief meeting. Brother Bell and I went into the office, and without any comment handed Mr. Martin the letter. Mr. Martin proceeded to read the letter, * * *.

"After reading the letter, Mr. Martin asked if we were certain that the Union was within its rights, that Thompson had—that we were certain that Thompson had not been denied membership for reasons others [sic] than non-payment of an initiation fee and dues, and was membership available on the same terms as to other members. * * * We told him that we assured him that we were convinced that we were within our rights; *that Mr. Thompson had failed to take the proper steps to become a member, to pay initiation fee or to tender a traveling card in lieu of the initiation fee, and to pay dues. Therefore, we requested his termination.*" [Emphasis supplied.]

Martin himself testified with respect to the meeting with Bell and Bailey on September 19 as follows:

"They gave me the letter and told me that they wanted Mr. Thompson's services terminated within that week. I asked them a question, how or why they arrived at the fact that Mr. Thompson had failed to become a member. They told me he had neither * * * given them any traveling card or paid dues into Local 1264, which is our contracting Local, and that they were giving me this letter and making this request based on our existing contract. We discussed that pro and con, and they insisted on their request * * * Mr. Bailey explained to me that they had requested from Mr. Thompson a traveling card or dues or to straighten himself out with the local. Frankly, I was at a loss. I didn't know he had left Local 1264, so I was more or less handicapped. I was under the impression that he was still in our contracting local."

It seems to us that Martin could hardly form a rational belief in the matter, with Bailey and Bell telling him that Thompson had not tendered nor paid dues, and Thompson telling him the contrary. True, Thompson did show Martin

money orders that the union had returned to him; but Martin had no information as to whether these were in sufficient amounts or whether there was not some defect in the tender. Thompson was evidently not too sure about that himself when he talked with Martin on September 19. He testified:

"Mr. Martin asked me what the situation was, and I told him that I had been in telephone conversation with Vice-President Barker [of the IBEW], and he had told me what to do, and that I had *tried* to carry out his instructions, * * *.

"I explained to him that I had made application for membership in the union, and tendered dues and assessments, and I *thought* I had complied with the membership requirements of the Taft-Hartley Law, and requested that he not take action on the letter, that I felt like that if I could get in touch with Vice-President Barker, he would straighten the situation out, and that I had told him that I would do what he said, and that I had *tried* to do it." [Emphasis added.]

It would seem that because of Thompson's uncertainty a reasonable person in Martin's position would not form a belief on September 19 one way or the other about the validity of Thompson's tender, notwithstanding his knowledge of the money orders. Nor did any information come to Martin's attention before the time of Thompson's discharge on September 22 which constituted a rational basis for believing the union's request for discharging Thompson was for something other than non-payment of dues. Through September 19 both the local union officers, Bailey and Bell, had told him that "Thompson had failed to take the proper steps to become a member, to pay initiation fee or to tender a travel card in lieu of the initiation fee, and to pay dues." This was the last word he had had from the local officers. Thereupon, since, in his last conversation with Thompson, Thompson had told

him that if he could get in touch with Vice-President Barker (of the International Union) he would straighten the situation out, Martin then 'phoned Barker himself, calling him in a distant city. This call was made by Martin after the conversations with Bailey and Bell, representing the Union, and Thompson, the employee. The following conversation ensued:

"I called up Mr. Barker in Atlanta, Georgia, and I explained to him who I was—I didn't know the gentleman—and the reason for my calling was that the Company had been placed in a very embarrassing position, in that we seemed to have been an innocent bystander in a squeeze, and I was asking him for, frankly, information as to exactly what I should do. He said he had talked to Thompson and explained to Thompson the proper procedure in which to send his traveling card and/or dues, and dues, to Local 1264, and that by so doing by the end of the week there wouldn't be any more trouble, and I would be and the Company would be relieved of this embarrassing situation.

"I said, 'In the event that doesn't hold true, what is the duty of the Company in this matter?' He said 'You have a contract with Local 1264, and it is your duty to live up to that contract,' and that was my conversation with Mr. Barker."

The next thing that happened was that Thompson left in the Company's office a copy of a letter written by him on September 20, in which he indicated that he was mailing his traveling card to Bell. In the light of the assurances Martin had received from all three union representatives that Thompson could straighten his status out *either* sending in a traveling card *or* by paying initiation fees and dues, Martin had every right to rely on the assumption that Thompson had elected to qualify by supplying his traveling card in lieu of dues and initiation fee. Thereafter, affairs

came to a quick conclusion; the local officials called on Martin on September 22, the last day of the work week and demanded that the termination letter be handed to Thompson. Martin, with Thompson's letter before him, asked the local officials if they had not received the traveling card. They stated they had not. They then said "they were fully convinced it would have no effect (on the termination letter) since they had never seen it. They had never received it."

Thereupon Martin called Thompson and handed him a dismissal letter and Thompson again protested, saying, "I feel like it was a pretty dirty deal, that I had tried to take the necessary action to satisfy the local union, and no matter what I did they weren't satisfied."

Thompson did not assert that he had personally delivered the traveling card or made a correct tender of the dues and initiation fee to the union officials. On the other hand they had categorically denied receiving the card. Thompson's assertions that morning that he had sent money orders for initiation fee and dues to the union related to the earlier occasion, and because of his early expression of doubt about the effectiveness of this tender, and the fact that he had by this time elected to send in the traveling card in lieu of paying dues and fines, Martin can not be said to have had reasonable grounds to believe either that the earlier tender was effective or that Thompson had effectively adopted the alternative method which was open to him.

The word "believe" as used in the Act, 29 U.S.C.A. § 158(a) (3) (A) and (B), means to be convinced or to feel that something is true or at least probable. Upon consideration of the record as a whole, we conclude that there was no substantial evidence to show that the Company or its General Manager Martin had reasonable grounds to believe, that is, grounds to form a rationally justified belief, that the union's request to dismiss Thompson was for anything other than his failure to tender dues and initiation fees.

Therefore, as to that part of the Board's order which relates to Respondent Pape Broadcasting Company, enforcement is denied; as to that part relating to Respondent Local Union 1264, IBEW, AFL, enforcement is granted.

On Petition for Rehearing

PER CURIAM.

On petition for rehearing, the Board reargues the facts whereon it sought to have enforced its order against the Pape Broadcasting Company, particularly our appraisal of the testimony of Bell, Bailey and Thompson. Upon careful consideration of the arguments advanced, we nevertheless adhere to our original opinion. However, as the petition rightly points out, the last sentence of our opinion should have read and is corrected to read as follows: "Therefore, as to that part of the Board's order which relates to Respondent Pape Broadcasting Company, enforcement is denied; as to that part relating to Respondent Local Union 1264, IBEW, AFL, enforcement is granted."

The motion for rehearing is denied.