**NATIONAL LABOR RELATIONS
BOARD, Petitioner,**

v.

**The LEECE-NEVILLE COMPANY and
International Brotherhood of Electrical
Workers, Local Union 1377, AFL-CIO,
Respondents.**

No. 15355.

United States Court of Appeals
Sixth Circuit.

April 9, 1964.

Elliott Moore, Washington, D. C., for petitioner, Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Robert B. Schwartz, Atty., N. L. R. B., Washington, D. C., on the brief.

Frank M. Swift, Atlanta, Ga., for respondent, Leece Neville, Luther P. House, Jr., Smith, Swift, Currie, McGhee & Hancock, Atlanta, Ga., on the brief.

Thurlow Smoot, Cleveland, Ohio, for respondent IBEW Local Union 1377, AFL-CIO.

Before PHILLIPS, Circuit Judge, and KAESS and WEINMAN, District Judges.

WEINMAN, District Judge.

This case is before the Court on the petition of the National Labor Relations Board for enforcement of its order issued on December 11, 1962 against respondents, The Leece-Neville Company (hereinafter referred to as the Company) and International Brotherhood of Electrical Workers, Local Union 1377, AFL-CIO (hereinafter referred to as the Union).

The Board's order of December 11, 1962 was based upon its findings that the Union violated Section 8(b) (2) and 8 (b) (1) (A) of the National Labor Relations Act (hereinafter referred to as the Act) by causing the discharge of seven employees for reasons other than failure to tender periodic dues uniformly required as a condition of Union membership and that the Company violated Section 8(a) (3) and (1) of the Act by discharging the employees upon the Union's demand when it had reasonable grounds to believe that the employees' membership in the Union had been suspended for reasons other than nonpayment of the required dues.

The record reveals no material dispute as to the following facts: In 1957, a group of dissident employees, while still members of the Union, formed a rival organization called the Electrical Workers Alliance, Inc. to supplant the Union

at the Company's plant. Under instructions from their counsel to harass the Union, several hundred members of the rival group withdrew their checkoff authorizations. Thereafter, the seven complainants,[1] and many others, began paying their dues to the Union through a collector named Josephine Sturtz, a leader of the rival organization. Upon her transfer to another department in the early summer of 1958, Rose Brodnik, another leader of the rival organization, took over her role as dues collector for this group.

Regarding union membership, the collective bargaining agreement between the Union and the Company contained the usual union security clause which provided:

"Section 1. (a) The Company agrees that for the period of time covered by this Agreement it is a condition of employment that all employees subject to this Agreement shall become and remain for the duration of this contract members in good standing of the Union. All new employees covered by this Agreement must, as a condition of continued employment, after their first thirty (30) days of employment, become and remain members of the Union."

Regarding monthly dues, the Union's bylaws provided, as herein pertinent:

"Section 3. The monthly dues shall be $4.00.

"Section 4. $1.00 refund of dues collected for attendance of monthly meetings."

However, since November 30, 1959, the amended bylaws no longer provide for a refund for meeting attendance.

For various months in the summer of 1958, the Union rejected the tenders of dues from the seven complainants. The Court does not deem it necessary to recite the details regarding the tenders by these employees and the various rejections by the Union. For the purpose of this opinion, it is sufficient to state that the Union's rejections were for one or more of the following reasons:

(1) A tender of $3.00 was not proper since the Union's dues were $4.00 and if the employee wanted the $1.00 refund, he would have to attend the monthly meeting and take it at the door, (2) a tender of $4.00 was not proper since it was commingled with tenders of other employees in the amount of $3.00 and (3) a tender was not proper since it was commingled with a tender of a suspended or expelled member of the Union.

■ Subsequent to the foregoing rejections, six complainants made current payments of dues in the amount of $4.00 for all months through March 1961. The other complainant, Dudash, made current payments of dues in the amount of $4.00 through February 1961. All of the foregoing payments were accepted by the Union but applied to the earliest months for which the Union's records showed no payment. Accordingly, on May 1, 1961, the Union's books showed that all of the complainants, except Dudash, were in arrears in payment of their dues for February, March and April of 1961; Dudash was in arrears for an additional month, January 1961. The dues for May were not due and payable until May 5 so none of the seven had paid his or her May 1961 dues prior to the discharge on May 3.[2]

On May 2, 1961, the Union sent to the Company individual letters demanding the discharge of each of the seven complainants on the ground that each was no longer a member in good standing.

---

1. Edward Clark, Anton Draganic, Joseph Dudash, Mary Jaksic, Betty Sipos, Anna Tomko and Louise Yomnick.

2. The Union argues that the May dues were due on May 1 because of a bylaw which provided: "Dues are payable monthly in advance." However, the Board correctly found that the dues were due and payable on Friday, May 5, pursuant to a notice posted by the Union in 1958 which stated that dues were due "the first Friday of each month."

On the following day, May 3, the Company, after consulting its counsel, discharged the seven employees. The Company concedes that it made no investigation or other inquiry, except to consult its legal counsel, to seek verification of the validity of the Union's demands before it discharged the seven employees on May 3, 1961.

Four of the employees, Jaksic, Sipos, Tomko and Yomnick were discharged together in the office of the Company Superintendent, Mr. Speck. At that time, Speck was advised that each had paid her dues through Brodnik and that the Union had rejected their tenders of dues. Brodnik was then called to the office and she stated: "those people are all paid up."

Clark's wife telephoned the Company's Personnel Director, Mr. Siegworth, and told him that her husband had sent in two months' dues which were refused by the Union and in her opinion her husband was not delinquent.

Dudash and Draganic, when informed of their discharge by Company officials, also stated that they regularly had paid their dues.

On May 4, all seven discharged employees went to the Union's office and paid the amounts which the Union claimed they owed, plus a reinstatement fee of $1.00 and the dues for May.

After they made the aforesaid payments, the Union's Business Agent, Mr. Zicarelli, called Siegworth and asked him to rehire the seven discharged employees. Siegworth advised him that they could be rehired only as new employees and that they could be rehired only after employees who had been laid off for economic reasons had been recalled.

On August 18, 1961, Zicarelli wrote a letter to the Company stating: " * * * we do not have any objection to your rehiring the discharged employees but in fact wish you to rehire each of them."

As in his previous request to the Company, Zicarelli made no mention of the employees' former status.

In December 1961, all seven complainants were rehired as new employees without credit for previous service.

Upon the foregoing facts, the Board, two members dissenting, found that the Union and the Company had engaged in certain unfair labor practices and ordered each to cease and desist therefrom and further ordered certain affirmative action designed to effectuate the policies of the Act.

*As to the Union.* The first question to be determined is whether a tender of $3.00 in the summer of 1958 was a valid tender of dues. The Board majority, relying upon the case of The Electric Auto-Lite Company,[3] held that under the Union's bylaws the amount of dues was only nominally set at $4.00 per month and the actual dues were $3.00 per month; the $1.00 refund being a "fine" or "penalty." The two dissenting Board members characterized the $1.00 refund as a "reward" for attending the meeting.

■ In the Electric Auto-Lite case, the Union adopted a resolution which provided for the increase in the regular monthly dues from $1.50 to $2.00 and further provided that members who attended the monthly meetings would be exonerated, upon appropriate evidence, from the payment of the additional 50 cents. In that case, the Board held, at page 1074, that the 50 cents, with the condition of attendance attached, was a "fine" rather than part of regular monthly dues and stated that "regardless of the means adopted to institute this charge, the necessary and intended effect was to fix a penalty upon those members who did not attend the monthly meetings." And, at page 1077, the Board stated:

"The statute specifies that the 'periodic dues' be 'uniformly required.' This we read essentially to include the requirement that such

---

**3.** 92 N.L.R.B. 1072, enforcement granted, 196 F.2d 500 (6 Cir. 1952), cert. denied, 344 U.S. 823, 73 S.Ct. 22, 97 L.Ed. 641 (1952).

dues be charged to all members alike or that any distinctions in amount be based upon reasonable general classifications. A charge which distinguishes between individual members who attend particular meetings and those who do not attend particular meetings, in our opinion, is not one 'uniformly' applied. Moreover, we do not doubt that a member's attendance at a union meeting is highly desirable and salutary to carry out the democratic process. But, as we have already held, [citing Union Starch & Refining Company, 87 N.L.R.B. 779] the Act as written may not be used as a means of *requiring* such attendance. The Act's machinery is equally unavailable to enforce the collection of a *fine* to accomplish this union objective."

Accordingly, the Board held that since the charge for nonattendance of union meetings was a "fine" rather than a payment encompassed within the term "periodic dues," the Union violated Section 8(a) (3) and 8(b) (2) of the Act when it caused the discharge of an employee for nonpayment of dues.[4]

 In the instant case, this Court is in agreement with the following language and findings of the Board majority:

"We see no essential difference between the two cases. As in the Electric Auto-Lite case, the Union's bylaws here, by incorporating into the nominal monthly dues of $4.00 a charge of $1.00 for nonattendance at Union meetings, created a dues structure based upon attendance or nonattendance at Union meetings. Members who did not attend Union meetings had to pay $4.00 per month. For members who attended such meetings the dues were fixed at $3.00 a month. In the Electric Auto-Lite and other cases, [citing cases] the Board held that the statutory provision that the periodic dues and initiation fees be 'uniformly required' includes the requirement that dues be charged to all members alike, and that any distinction be based upon a reasonable classification. A classification of employees based upon attendance or nonattendance at Union meetings was held to be not a reasonable classification. The Trial Examiner attempts to distinguish the Electric Auto-Lite case on the ground that here the Union intended the one dollar payment to operate as a 'reward for attendance' rather than a charge for nonattendance. However, the bylaws by defining the payment as the 'One Dollar refund of dues' clearly tied it up with the dues structure. This the Union had no right to do. We find that the complainants herein were not lawfully required in the summer of 1958 to pay as a condition of employment a charge of one dollar for nonattendance at Union meetings, and that the tender of dues in the amount of $3.00 was at the time a valid tender of dues. We also find that the tender of dues in the summer of 1958 in the amount of $4.00 per month, but rejected by the Union on the ground that it was commingled with the tender of dues in the amount of $3.00, was likewise a proper tender, inasmuch as there was in fact no commingling of sufficient and insufficient tenders." [5]

4. Of course, a union may fine its members for refusing to attend meetings but " * * * the internal rules of a labor organization, designed to control its members, such as imposition of fines for failure to attend meetings, special assessments, and other penalties, not being 'periodic dues,' may not be enforced by the union by a threat of loss of employment. * * * " [Citing numerous cases, including N. L. R. B. v. Electric Auto-Lite Company, supra]. N. L. R. B. v. Spector Freight System, Inc., 273 F.2d 272, 276 (8 Cir. 1960).

5. Joint Appendix, pages 7a and 8a. The Joint Appendix is the record in this case and was filed by the parties. It is, of course, to be distinguished from the Appendix to this opinion.

This Court's approval of the foregoing language of the Board majority disposes of two of the three reasons advanced by the Union for its rejections of tenders of dues, i. e., that a tender of $3.00 was not proper since the Union's dues were $4.00 and that a tender of $4.00 was not proper since it was commingled with tenders of other employees in the amount of $3.00. However, neither the Board majority nor the dissent made any statement in their respective opinions regarding the third reason for rejection of tenders of dues, i. e., a tender of dues was commingled with a tender of a suspended or expelled member of the Union.

■ The Court finds that the Board was justified in refusing to place emphasis upon the third reason advanced by the Union. The Court has examined the letters whereby the Union rejected the tenders of dues. The first letter, dated July 30, 1958,[6] makes no mention whatsoever of the refusal to accept the tender because of commingling with suspended or expelled members. The second letter, dated August 25, 1958 does;[7] however, it is clear from the record that the Union's basic reason for the rejection was its insistance that the dues were $4.00 and the $1.00 refund must be obtained at the meeting. And it must be noted that had the members whose tenders were rejected by the aforementioned letters resubmitted dues in the sum of $3.00, those tenders would have been rejected.

■ The Court further finds that there is substantial evidence in the record to support the Board's finding "that at all times relevant to this proceeding the Union considered the grace period to be at least 3 months; and at the time of the discharges, none of the dischargees was in fact delinquent for that long a period."[8]

■ And finally, and the Court could have based its affirmance of the Board's order regarding the Union on this point alone, there is substantial evidence in the record to support the Board's finding that the Union, by its conduct from September 1958 through April 1961 waived any right it might have had to secure the discharge of these seven employees because of their alleged delinquencies.[9]

■ The Court concludes that there is substantial evidence in the record to support the Board's finding that the Union violated Section 8(b) (2) and 8 (b) (1) (A) of the Act by causing the Company to discharge seven employees for reasons other than failure to tender periodic dues uniformly required as a condition of Union membership.

Accordingly, the Board's order regarding the Union is ordered enforced.

*As to the Company.* With respect to the Company, the Board found:

> " * * * Having failed in these circumstances to make an investigation, which would have disclosed that there was tender and rejection by the Union of the 2-month dues in behalf of the dischargees, the Company may not justify the discharge on the ground that it had no reasonable grounds for believing that membership of the complainants in the Union was terminated for reasons other than the failure of the complainants to tender periodic dues and initiation fees uniformly required as a condition of retaining membership in the Union." [Footnote omitted.] [10]

■ The Court finds burdensome the investigation which the Board would have required the Company to conduct. To determine whether or not the employees were actually delinquent in the

---

6. General Counsel's Exhibit No. 9-A, Joint Appendix, page 271a. Reproduced at Appendix I to this opinion.

7. General Counsel's Exhibit 10-A, Joint Appendix, page 273a. Reproduced at Appendix II of this opinion.

8. Joint Appendix, page 10a.

9. See Appendix III to this opinion for the Board's findings as stated in Joint Appendix, pages 11a and 12a.

10. Joint Appendix, page 14a.

payment of their dues would have entailed an extensive investigation. It would have required an examination of the Union's books, a judgment of the credibility of the persons involved and an interpretation of the Union's bylaws. A burden such as this should not be placed upon the Company.

Regarding the Company's duty in this matter, Section 8(a) (3) (B) provides:

" * * * That no employer shall justify any discrimination against an employee for nonmembership in a labor organization * * * if he has reasonable grounds for believing that membership was denied or terminated for reasons other than the failure of the employee to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership."

In National Labor Relations Board v. Pape Broadcasting Company,[11] the Court enforced the order of the Board against the union, which had been found guilty of an unfair labor practice, for the reason that it caused the discharge of an employee because of his membership in another union. However, the Court refused to enforce the order against the company which had discharged the employee at the union's request. The Court, at page 200, noted that there was evidence in the record supporting the inference that the company committed unfair labor practices and evidence tending to negate that inference. Then, after stating its duty to examine the entire record, the Court said:

" * * * we take cognizance of the obvious truth that in forming beliefs reasonable men do in fact consider all the information available, and that in consequence, 'reasonable grounds to believe' may not be inferred from *isolated* facts but on the contrary must consist of *all* the conflicting evidence available to the person sought to be charged with the belief, which furthermore must be sufficient for a reasonable man to form a belief upon evaluation thereof."

The Court then, at pages 201 and 202, reviewed certain testimony in the record and concluded:

"It seems to us that * * * [the company] could hardly form a rational belief in the matter, with * * * [the union] telling him that * * * [the employee] had not tendered nor paid dues, and * * * [the employee] telling him the contrary. True, * * * [the employee] did show * * * [the company] money orders that the union had returned to him; but * * * [the company] had no information as to whether these were in sufficient amounts or whether there was not some defect in the tender. * * *"

And finally, at page 203, the Court defined the word "believe" as used in the Act at Section 8(a) (3) (A) and (B) to mean "to be convinced or to feel that something is true or at least probable." As previously stated, the Court refused to enforce the order against the company.

▪ The instant case presents a situation similar to that in the Pape case. Here the Company also had only isolated and conflicting facts before it and it should not be obligated to conduct an extensive investigation to determine the merit of the Union's demand to discharge the seven employees.

The Court concludes that there is not in this record substantial evidence to support the Board's findings that the Company had reasonable grounds for believing that the employees' membership in the Union had been suspended for reasons other than failure to tender the required dues and that by acceding to the Union's demand to discharge the employees the Company violated Section (8) (a) (3) and (1). Accordingly, enforcement of the order of the Board regarding the Company is denied.

11. 217 F.2d 197 (5 Cir. 1954).

APPENDIX—I

### APPENDIX TO OPINION OF THE COURT

GENERAL COUNSEL'S EXHIBIT
NO. 9–A

"Certified Mail

July 30, 1958

Dear Sister Brodnik:
1022 Dillewood Rd.,
Cleveland 19, Ohio

Dear Sister Brodnik:

We are returning the Bank Money Order in the amount of $70.00, together with the list of the members for whom the check represents monthly dues.

It is necessary that we return the check in the full amount because monthly dues is (sic) $4.00 and two names appear on the enclosed list for only $3.00. Will you please forward the correct amount.

Thank you.

Fraternally yours,
P. J. ZICARELLI
*Business Manager*

PJZ/mvc
Encl: (Check $70.00)
List"

APPENDIX—II

### GENERAL COUNSEL'S EXHIBIT NO. 10–A

"CRRR

August 25, 1958

Mrs. Rose Brodnik,
1022 Dillewood Rd.,
Cleveland 19, Ohio

Dear Sister Brodnik:

We are returning various Cleveland Trust Company money orders which you sent us to cover dues for members at Leece-Neville for the months of July and August. As you will note from our letter of July 30, 1958, all dues are $4.00 per month. Each list which you sent us in your recent letter shows one person as paying $3.00 only, therefore, such money order and list cannot be accepted. Also, Mary Bank appears on one list for July and also one list for August. Mary Bank is not a member of this Union,

therefore, dues cannot be accepted for her.

As soon as you have returned money orders for additional amounts to cover those members sending in only $3.00 we will return proper receipts.

We are returning Cleveland Trust Co. money order #268634 in the amount of $101.00—#268044 in the amount of $23.00—#215417 in the amount of $15.00 and #215448 in the amount of $15.00, together with the lists of names which each money order covers.

Fraternally yours,
P. J. ZICARELLI
*Business Manager*

PJZ/mvc
Encl."

APPENDIX—III

### BOARD'S FINDINGS AS STATED IN JOINT APPENDIX,
Pages 11a and 12a

"We believe, moreover, that the Union has waived any right it may have had to secure the discharge of these employees because of their alleged delinquencies. Ever since September 1958 and until April 1961, the complainants made their successive payments of current dues through collector Brodnik on the assumption that their tender of dues for 2 months in 1958 was a valid tender. The Union accepted these successive payments of dues with the knowledge of such claim, but adhering to its position that the tender was invalid, back-dated such payments by 2 months. Such a state of affairs continued without any change until the Union's decision to invoke the union-security clause against the complainants. After Zicarelli's letter of September 10, 1958, complainants Draganic, Sipos, Clark, Tomko and Yomnick were never contacted by any Union agent concerning the subject of dues delinquency. Jaksic and Dudash testified that they were approached in July 1960 and February 1961, respectively, by the Union agents, but when they told the agents that the Union refused the tender of dues for 2 months, the subject matter was

dropped. Having unlawfully refused to accept from the complainants the tender of 2 month dues in 1958, and thereafter for some 30 months having accepted their successive payments of current dues with the knowledge of their claim that the tender was lawful, the Union in our opinion is barred from reversing its position and invoking the union-security clause without an adequate notice to the dischargees." [Footnote omitted.]