NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

ZOE CHEMICAL CO., Inc., and Local 803,
Allied Aluminum and Industrial
Union, Respondents.

No. 29, Docket 31989.

United States Court of Appeals
Second Circuit.

Argued Oct. 9, 1968.

Decided Jan. 13, 1969.

William J. Avrutis, Atty., NLRB (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Allison W. Brown, Jr., Atty., Washington, D. C., on the brief), for petitioner.

Charles R. Katz, New York City (Katz & Wolchok, New York City, on the brief), for respondent Zoe Chemical Co., Inc.

Before FRIENDLY, ANDERSON and FEINBERG, Circuit Judges.

FEINBERG, Circuit Judge:

Over five years ago, respondent Zoe Chemical Co., Inc. was caught in the cross-fire of a struggle between two unions, one of which—Local 803, Allied Aluminum and Industrial Union—was then midway through a three-year collective bargaining contract with Zoe. At Local 803's request and in accordance with a judicially confirmed arbitration award, Zoe discharged twelve employees on October 4, 1963. Since then, it has found itself involved in a bitter legal battle before the National Labor Relations Board, culminating in a back-pay order which may subject Zoe to heavy liability. Before us now is the Board's petition to enforce that order; for reasons given below, we decline to do so against Zoe.

## I.

Although unaware of it at the time, Zoe's troubles started in March 1962, when it signed a collective bargaining agreement—apparently its first—with Local 803. The contract contained a standard union security clause, requiring the approximately 25 to 30 production employees "[a]s a condition of employment" to "become and remain members of the Union in good standing on the 31st day after date of employment." After achieving status as bargaining representative, however, Local 803 ignored the employees. For over a year, although dues were deducted from the wages of those who had signed check-off authorizations during Local 803's organization drive, the union security provisions were not enforced, no Local 803 representative came to the plant, there was no union steward, and the shop was not serviced by the Local. Understandably disenchanted by this treatment, some of the employees contacted another union, Local 8–149, Oil, Chemical and Atomic Workers International Union, AFL-CIO (Local 149); internecine warfare broke out almost immediately.

In June 1963, Local 149 filed a petition with the Board for a representation election, claiming that a majority of the unit had signed Local 149 authorization cards. However, the Regional Director dismissed the petition because a valid collective bargaining agreement with Local 803 was then in effect. Meanwhile, Local 803 stirred itself into action. Its president, Bernard Kalisky, visited the plant on June 21, while Local 149's petition was still pending, and explained to the employees that Local 803's contract barred them from bringing in another union. He also apologized for the union's neglect and promised to correct the situation in the future, stating that the union official who should have serviced the plant would be fired.[1] Kalisky also read the union security clause to the employees and warned them that they had to join Local 803 or he would have to request their discharge; he stated that past dues would be forgiven and the employees would be granted another 30 days to join up.

Thereafter, in June and in July, Kalisky and sometimes other union agents frequently returned to the plant to repeat the warning. During this time, Kalisky stated that the employees would also have to sign union membership cards in order to avoid discharge. However, prior to August 30, none of the subsequently discharged employees tendered either dues or initiation fees. Meanwhile, on July 15, Local 149 filed charges with the Board because the company refused to recognize it as a majority representative. The charge was withdrawn in August. On July 18, an employee filed a union de-authorization petition with the Board, seeking to nullify the union security clause and Local 803's contract. So far as appears from the record, this petition is still pending five years later.

On July 24, Kalisky wrote Zoe recounting what had transpired at the June 21 meeting. The letter also informed Zoe that although Kalisky had given the employees additional time to comply with the union shop provision, all except six, whom he named, had failed to do so. Kalisky therefore requested the company to discharge the noncomplying employees immediately. During this period, Local 149's organizer was pressuring Zoe not to enforce the union security clause, with the possibility of a strike implicit. Zoe posted Local 803's letter where all could see it but refused to discharge the employees. On August 5, Local 803 commenced arbitration proceedings under its contract to require Zoe to enforce the union security clause.[2] All notices regarding that proceeding were posted on the employee bulletin

---

1. That official resigned his position as an officer of the union in the following month.

2. On August 5, Local 803 also filed with the Board an unfair labor practice charge against Zoe because of its refusal to honor the union security clause. The charge was dismissed on October 15 by the Regional Director.

board. The hearing was attended by representatives of Zoe and Local 803, but neither the employees nor Local 149, although otherwise represented by counsel, attended or intervened. In the arbitration proceeding, Zoe resisted Local 803's demand, pointing out that discharge of "practically the entire unit * * * at its then busy season would constitute economic hardship." On August 26, arbitrator Jerome J. Lande, former general counsel of the New York State Board of Mediation, ruled that the union security agreement was clear and directed Zoe to discharge those of its employees in the unit "who have failed to join the union on or before Sept. 3." Upon receipt of the award, Zoe posted it on the bulletin board, and in the next few days Zoe's president explained its impact to the employees. Local 803 sought confirmation of the award in the Supreme Court of the State of New York and obtained an order of that court, dated September 30, which confirmed the arbitrator's award. On October 4, 1963, Zoe complied with the award.[3]

Within a week or two, the discharged employees filed charges with the Board, claiming that they had properly tendered dues and initiation fees, a factual issue to be discussed below. In February 1964, the Board's General Counsel issued a consolidated complaint against both Local 803 and Zoe, charging the former with violating sections 8(b) (1) (A) and 8(b) (2) of the National Labor Relations Act, 29 U.S.C. §§ 158(b) (1) (A), (2) and the latter with violating sections 8(a) (1) and 8(a) (3), 29 U.S.C. §§ 158(a) (1), (3). The gist of these charges was

that Local 803 had unlawfully enforced its union shop contract with Zoe, by rejecting timely tendered of dues and fees and by causing Zoe to discharge the employees because of rival union activities and that Zoe had wrongfully gone along with this improper scheme.

There then ensued a lengthy legal struggle before the Board, which required two separate decisions by the hearing examiner, two appeals to the Board and decisions by it, 13 days of hearings and almost 2,000 pages of transcript, before culminating in a Board order in September 1966, almost three years later. The chief issues litigated involved the alleged attempt of the discharged employees to make a proper tender of dues and initiation fees before their discharge. The employees maintained that they offered to pay dues on August 30, 1963, but that Kalisky insisted that they also sign union membership cards,[4] and when they replied that they were not required to do this,[5] he rejected their tender. Local 803 sharply disputed this testimony, but in his first decision the trial examiner did not decide the issue whether dues had actually been tendered. His theory was that the employees were also required to tender the $25 initiation fee with the $5 dues, "to test the Union's willingness to accept them in fulfillment" of the contract obligations; since that additional tender was not made, the discharges were proper. Accordingly, in a thorough and well-reasoned opinion, he recommended that the complaint against Local 803 and Zoe be dismissed. However, the Board did not accept this view, holding, as the examiner properly con-

3. In this general period, the inter-union struggle erupted in another legal maneuver. On August 23, Zoe discharged several employees, not involved in this case. Local 149 promptly filed charges with the Board, alleging that the discharges were discriminatory. On October 15, the Regional Director dismissed the charges because of insufficient evidence.

4. These cards contained the following statements:

I hereby accept membership in Local No. 803 and of my own free will hereby authorize Local No. 803 its agents

or representatives to act for me as a collective bargaining agency in all matters pertaining to rates of pay, wages, hours, or other conditions of employment.

I also agree to abide by the constitution and by-laws and the rules and regulations of the Union and its International Union.

5. They had been so advised the previous evening by Local 149 representatives after a telephone conversation with that Local's attorney.

strued it, that if the charging parties were believed, an additional tender of initiation fees would have been futile "since the Union had demanded more than it was legally entitled to, namely, signed authorization cards." Accordingly, the Board directed the examiner to resolve the factual issues on the tender.

The examiner thereupon reopened the record for additional evidence and made further findings; the most significant were that tender of dues was made to Kalisky at noon on August 30, 1963, and that Kalisky rejected the tender because the employees refused to sign membership cards. The examiner therefore concluded, under what he regarded as "the law of the case set down in the Board's" remand, that Local 803 had caused the discharges for reasons other than failure to tender dues and initiation fees and had violated the Act. The examiner went on to hold that Zoe did not have "reasonable grounds for believing that Local 803's discharge request was predicated on the employees' failure to pay dues," and that, therefore, Zoe also violated the Act when it discharged the employees. The examiner's recommended order required Zoe to offer reinstatement and held Zoe and Local 803 jointly and severally liable for backpay until April 6, 1964, when the Local notified Zoe that it had no objection to reemployment of the employees; after that date, only Zoe would be liable for backpay. These findings were adopted by the Board, except that for the period prior to April 6, 1964, Local 803 was "primarily liable" and Zoe was liable only "secondarily." Even this might be scant consolation for Zoe, since Local 803 is apparently no longer in existence.[6]

This summary has skimmed over a number of other factual issues decided before the Board.[7] Those proceedings have also generated a surprising quantity of legal issues in this court.[8] However, we conclude that we need not deal with most of them because the issue of the validity of the key finding against Zoe is dispositive. We note, moreover, that Zoe stands alone before us in contest with the Board because Local 803 has not appeared.

## II.

We now turn to the legal basis of the Board's case against Zoe. The Board's order found that Zoe violated sections 8(a) (3) and (1) of the Act. Since the finding as to the latter depends upon the former, we turn to section 8(a) (3), which provides, in pertinent part:

Sec. 8(a) It shall be an unfair labor practice for an employer—

\* \* \* \* \* \*

(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: *Provided,* That nothing in this Act, or in any statute of the United States, shall preclude an employer from making an agreement with a labor organization (not established, maintained, or assisted by any action defined in section 8(a) of this Act as an unfair labor practice) to require as a condition of employment membership therein on or after the

---

6. The Board informs us that another union may have successor liability.

7. E. g., that the employees did not, as they originally claimed, make a second tender of dues to Local 803 on the evening of August 30; that Local 803 was not motivated by a desire to punish the dissident employees for their rival union activity.

8. These include: the adequacy of a tender of dues without initiation fees or of a tender of partial dues only; the date by which such a tender must have been made, and the effect of the arbitration decree

on that date; the authority of the hearing examiner to reopen the hearings on his own discretion; whether the hearing examiner properly credited the testimony of various witnesses; the claimed abuse of the Board's processes by the employees; the effect of the New York Supreme Court order confirming the arbitration award on the legality of Zoe's actions; the legality of the requirement that the employees sign membership cards; whether Zoe had "reasonable grounds for believing" that the union's discharge request was for impermissible reasons.

thirtieth day following the beginning of such employment or the effective date of such agreement, which ever is the later, * * * *Provided further,* That no employer shall justify any discrimination against an employee for non-membership in a labor organization * * * (B) if he has reasonable grounds for believing that membership was denied or terminated for reasons other than the failure of the employee to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership * * *.

The ultimate legal question before us then is the validity of the examiner's finding, adopted by the Board, that Zoe

> had reasonable grounds to believe that the employees' membership in the Union was denied for reasons other than failure to tender the uniformly required periodic dues and initiation fees.

 Section 8(a) (3) (B) was inserted into the National Labor Relations Act in 1947 by the Taft-Hartley amendments in that year. The congressional aim was to eliminate the most serious abuses of compulsory unionism by abolishing the closed shop, while permitting other forms of union security to continue, thus requiring all employees to share in certain minimum financial burdens of the union. See NLRB v. General Motors Corp., 373 U.S. 734, 83 S.Ct. 1453, 10 L.Ed.2d 670 (1963), noted in 11 U.C.L.A.L.Rev. 143 (1963). Thus, the emphasis in the Act is on limiting "the sanction of discharge to failure to tender periodic dues and initiation fees." NLRB v. Local 3, Retail Store Union, 216 F.2d 285, 287 (2d Cir. 1954). Moreover, in order to protect employees against union attempts to discriminate for other reasons, the Act contemplates potential liability of an employer who meekly submits to a union's illegal intentions. E. g., NLRB v. Shear's Pharmacy, Inc., 327 F.2d 479, 481 (2d Cir. 1964). But, unlike the liability of

a union, which is based upon causing or attempting to cause employer discrimination, the employer is liable only "if he has reasonable grounds for believing" that the union has denied membership for reasons other than failure to tender the required dues and initiation fees. Obviously, therefore, before an employer can be held liable, questions of his belief and the reasonableness of holding it are crucial.

The factual findings of the trial examiner on which he based his conclusion that Zoe had violated section 8(a) (3) are as follows:[9] On September 4, after Kalisky had asked Zoe to fire the 12 employees and had himself told them not to return to work, they told Axelrod, Zoe's president, that they had "offered him (Kalisky) the dues" and stated that "According to the law we are supposed to offer them [dues]. But we don't have to join any union." All testified that Axelrod ordered them back to work after reminding them that it was he, not Kalisky, who did the firing. Axelrod denied that any mention had been made at this meeting of dues offers or union cards.

On October 4, after the court order enforcing the arbitration award had issued, Kupetz, the co-owner of the business, assembled the employees and told them that he "had to discharge" them because they were not "members of Local 803." Various employees testified that they told Kupetz, "We offered the dues. * * * Can't we just pay our dues and still work here?" Kupetz denied "any discussion" on or before October 4 about dues or about whether Local 803 had refused to accept the employees because they failed to sign union cards.

In his supplemental decision, the trial examiner credited the employees' testimony and concluded:

> Accordingly, I find, as the charging parties testified, that before and at the time of the discharges, they informed the Company of the fact that they had tendered dues to Kalisky

---

9. These findings were adopted by the Board in its order.

and that the latter had rejected their tenders.

He further noted:

A prudent employer, familiar with these facts, would at least have investigated the matter to determine if Kalisky's discharge demands exceeded permissible limits,

and held that the discharge "must have been based on a ground other than the employees' failure to make the statutory tender."

We accept the trial examiner's findings as to the two conversations between the employees and the company's managers. But it does not necessarily follow that the examiner correctly decided the question whether Zoe had "reasonable grounds for believing" that membership was denied for a reason other than nonpayment of dues and intiation fees, i. e., because the employees refused to sign cards. Resolution of that issue requires careful consideration of the probable subjective impact of all of the circumstances leading up to the employees' discharge. This type of evaluation, especially in a case as factually complex as the present one, poses no simple task. The legislative history of section 8(a) (3) (B) and the comparatively few cases that have interpreted its language do not shed much light on the standards to be applied in determining whether information conveyed to an employer must have been sufficient either to create the requisite condemned belief or to prompt at least a further injiury into the union's discharge demand.[10]

Clearly some kind of specific information as to the illegality of the union's request must be communicated to the employer: "In order to hold the employer * * * there must at least be proof that he knew he was acting for an impermissible cause." NLRB v. Local 138, IUOE, 293 F.2d 187, 197 (2d Cir. 1961). Absent actual knowledge of some sort, the employer has no duty independently to inquire into the circumstances behind the union's demand.[11] Where the employer is given sufficient reason to suspect that the demand might be improper, however, he does have a duty to investigate, though his initial doubt may fall short of "reasonable grounds for believing."[12] This duty in turn gives rise to difficult questions of interpretation: How much probable doubt is necessary to require further inquiry, and how far must the employer go to allay his doubts, either in ascertaining the true facts or in resolving issues of law which they may raise? With these problems in mind, we turn to the facts of the present controversy.

10. The legislative history does, however, contain the statement that: "The tests provided by the amendment are based upon facts readily ascertainable and do not require the employer to inquire into the internal affairs of the union." S.Rep. No. 105, 80th Cong., 1st Sess. 20 (1947).

11. Thus, the employer has had no obligation to question a union's discharge demand if the employee himself does not deny that it is based on non-payment of dues, see Krambo Food Stores, Inc., 114 N.L.R.B. 241, 244 (1955), enforced as against the union sub nom. NLRB v. Allied Independent Union, 238 F.2d 120 (7th Cir. 1956), even though the employer may be unclear as to the ground on which the union's demand is based, and though the demand may seem unusual on its face, see Associated Transp., Inc., 169 N.L.R.B. No. 164 (March 5, 1968), enforced as against the union sub nom. NLRB v. Local 182, IBT, 401 F.2d 509 (2d Cir. 1968) (Employer said reason for discharge "[H]as something to do with your dues," 169 N.L.R.B. No. 164 at 2; demand was made by "a union representative with whom the Employer did not normally deal, on behalf of a Local with which the Employer had no dealings," id. at 6 (dissenting opinion)).

12. Investigation may be required under some circumstances where the employer is confronted with the employee's claim that he had paid or tried to pay the dues, see NLRB v. Die Makers Lodge No. 113, 231 F.2d 298 (7th Cir.), cert. denied, 352 U.S. 833, 77 S.Ct. 50, 1 L.Ed.2d 53 (1956); Staats Dairy Transp., Inc., 162 N.L.R.B. No. 97 (Jan. 22, 1967), or was not legally obligated to do so, see May Dep't Stores, Inc., 133 N.L.R.B. 1096 (1961), or that an improper fine was being demanded as well as dues, see NLRB v. Eclipse Lumber Co., 199 F.2d 684 (9th Cir. 1952).

The trial examiner did not find—and the record does not establish—that Zoe knew that the reason for the union's failure to accept the employees' tender was their refusal to sign union membership cards. In neither of the two critical meetings between the employees and management was this basic issue emphasized, and there is little in the record to suggest that Zoe was aware of it.[13] Assuming then, that Zoe was in fact ignorant of the real reason for Local 803's discharge request, the decisive question is whether the employees' protests that "we don't have to join any union" or "we offered the dues" were sufficient in their context to raise a suspicion that the union might be demanding an illegal condition to membership.

Looking at the entire, complicated background of the dispute between the dissident employees and Local 803, we do not agree with the trial examiner or the Board that Zoe must have suspected that the union's demands were illegal. In one of the few cases which have discussed the meaning of the statutory phrase, "reasonable grounds for believing," the court stated:

[T]he Act * * * requires us to consider the record as a whole, and * * * we take cognizance of the obvious truth that in forming beliefs reasonable men do in fact consider all the information available, and that in consequence, "reasonable grounds to believe" may not be inferred from *isolated* facts but on the contrary must consist of *all* the conflicting evidence available to the person sought to be charged with the belief, which furthermore must be sufficient for a reasonable man to form a belief upon evaluation thereof.

NLRB v. Pape Broadcasting Co., 217 F.2d 197, 200–201 (5th Cir. 1954). In *Pape*, an employee Thompson's timely tender of dues and initiation fees to the union was refused because of his reluctance to give up membership in another local of the same union. The company's manager admitted that union officials had told him that Thompson's failure to give them a traveling card was the reason for their termination request and that Thompson himself had told the manager that he had tendered his dues and fees. But looking at the whole record the court noted that on several other occasions union officials had assured the managment that Thompson had not tendered or paid his dues and that submission of a traveling card would constitute compliance in lieu of dues. Moreover, Thompson himself had indicated some uncertainty as to his compliance with the proper procedures. The court concluded:

The word "believe" as used in the Act * * * means to be convinced or to feel that something is true or at least probable. Upon consideration of the record as a whole, we conclude that there was no substantial evidence to show that the Company * * * had reasonable grounds to believe, that is, grounds to form a rationally justified belief, that the union's request to dismiss Thompson was for anything other than his failure to tender dues and initiation fees.

217 F.2d at 203.

■ In this case too, the controversy must be considered in perspective. The letter of July 24 from Local 803, which requested Zoe to discharge the employees, did not mention membership cards; in fact, it affirmatively stated that the membership requirement would be fully met if dues and initiation fees were paid.[14] Zoe did not discharge the

---

13. The testimony of the charging employees as to their conversations with Axelrod on September 4 and Kupetz on October 4 contains only a few fleeting references to "cards," none of which was specifically mentioned by the examiner.

14. The key paragraph of the letter was:
 I further told [the employees] that the requirement to become and remain a member of the Union in good standing would be fully satisfied if on the 31st day after June 21, 1963, each of

employees upon receipt, for the first time, of a union request, with no independent reason to believe that the union's claims were valid. See NLRB v. Die Makers Lodge No. 113, 231 F.2d 298 (7th Cir.), cert. denied, 352 U.S. 833, 77 S.Ct. 50 (1956). On the contrary, the employees here had for months vehemently and publicly expressed their opposition to Local 803. Zoe was well aware of their loyalty to the rival Local 149 and of their repeated efforts to obtain representative status for that union, as it was of Local 803's counter-efforts to enlist the company's employees. When Local 803 requested the discharge of the nonjoining employees in its letter of July 24, not only did the employees in question thereafter fail to protest the membership card requirement to the company, but, the hearing examiner found, they "wanted nothing to do with the contracting union" and "demonstrated that they 'were entirely unwilling to become members' on any basis whatsoever." The fact that neither the employees nor Local 149 made any attempt to participate in the arbitration proceeding from August 5 to 26, though on full notice of it, could reasonably have suggested to Zoe that they still refused to have anything at all to do with Local 803, including—most obviously—the payment of dues. Between August 30 and October 4, Local 803 president Kalisky continued to insist to company official Kupetz that the employees who refused to join the union be fired, while the employees themselves still failed to tell Zoe clearly of their objections to signing the membership cards.[15] In the light of this background of continuous and intense hostility to Local 803 on the part of the employees, we think that on the date of their discharge Zoe might very reasonably have believed that they still refused to meet such a valid union condition for membership as payment of dues. We are aware that the employees did protest that they had tendered their dues and did not have to "join" the union. But even if the company must have credited this claim, it might well have assumed that the employees still had refused to pay the required initiation fee, or, in the case of the October 4 termination meeting with Kupetz, that their tender of dues had been made after the September 3 deadline established in the arbitration decree. In any event, we cannot say that after months of open warfare between the employees and the union the "isolated facts" of the former's vague objections expressed to Zoe were sufficient to require Zoe to believe that they were being denied union membership for an impermissible reason.

Our conclusion is strengthened by comparing the facts of this case with the prototype situation to which section 8(a) (3) (B) was presumably directed: prompt and unquestioning acquiescence by the employer in discharging an employee towards whom the union is hostile or arbitrary. See, e. g., Staats Dairy Transport, Inc., 162 N.L.R.B. No. 97 (Jan. 22, 1967); cf. NLRB v. A & B Zinman, Inc., 372 F.2d 444 (2d Cir. 1967). Here Zoe steadfastly refused to fire the employees in question for over three months after their controversy with Local 803 broke out, and only finally did so under court order, when noncompliance might subject it to liability for contempt. The hearing examiner found that Zoe had maintained "strict impartiality" towards the inter-union strife, stating: "There is nothing in the record even suggesting company hostility toward, and interference with, the dissidents' rival union activity." Finally, several other employees from the original dissident group had become members of Local 803 before September 3. Far

---

them paid the regular initiation fee of $25 and $5 monthly dues and continued the $5 dues monthly thereafter.

15. Compare May Dep't Stores, Inc., 133 N.L.R.B. 1096, 1097 (1961), where the employer was "confronted by a clear-cut avowal by [the employee], iterated and reiterated, that she had orally resigned from the Union and was not compelled to pay the dues in issue."

from suggesting that the union was in any way "out to get" the remaining twelve in the group, this fact might well have strengthened Zoe's impression that the hostility of the remaining employees, rather than any discrimination against them on the part of Local 803, was the cause of the conflict.

 For the reasons set forth above, we do not think that whatever doubts Zoe may have had about the facts of the discharge demand were sufficient to constitute the "reasonable grounds for believing" required by the statute. Nor do we find that under the circumstances Zoe had a duty to investigate the situation further. Even if the company had been fully aware of the employees' claim that their tender of dues was improperly rejected for failure to execute membership cards—an assumption as to which the examiner made no finding, as noted above—we think that it would be an unduly harsh application of section 8(a) (3) to hold Zoe liable for discharging them. While there may well be situations in which an employer would have no justification for refusing to look into the merits of a union discharge request, this is not such a case. In determining the employer's duty in this respect, it is certainly relevant to consider both the burden which further inquiry would impose on him and the likelihood that investigation would lead to a prompt and certain resolution of his doubts. In NLRB v. Leece-Neville Co., 330 F.2d 242 (6th Cir.), cert. denied, 379 U.S. 819, 85 S.Ct. 41, 13 L.Ed.2d 31 (1964), a company discharged seven employees at the

union's demand in spite of protests by all the employees that they had paid or tendered their dues. The union had rejected the tenders primarily because they did not include an unlawful fine. The court reversed the Board's finding that the company had violated section 8(a) (3), holding that it was not under a duty to make a further investigation which

> would have required an examination of the Union's books, a judgment of the credibility of the persons involved and an interpretation of the Union's bylaws. A burden such as this should not be placed upon the Company.

330 F.2d at 248. Quoting at length from the *Pape* case, supra, the court pointed out:

> Here the Company also had only isolated and conflicting facts before it and it should not be obligated to conduct an extensive investigation to determine the merit of the Union's demand to discharge the seven employees.

Id.

 Whatever conclusion we might have reached on the facts of *Leece-Neville,* we agree with the principle that the Act does not contemplate an exhaustive investigation by the employer into the facts or legal implications of every union discharge request.[16] Requiring Zoe to resist Local 803's demands once again and conduct an investigation into the dispute, after Zoe was under the sanction of a court order, would impose too great a burden. The very length and complexity of the litigation in this case

---

16. See Producers Transp., Inc. v. NLRB, 284 F.2d 438, 443 (7th Cir. 1960) ("If this Company * * * could not reasonably rely upon a written statement by the Union's president that Pool had been suspended for nonpayment of his dues, then no employer can ever honor a discharge request made under a union shop agreement without first auditing the union's dues records."); G & H Prods. Corp., 139 N.L.R.B. 736 (1962), in which an employee was discharged for failure to pay a reinstatement fee by a certain date, although the employer knew that he had received some kind of extension. Holding

that the company was not at fault in discharging him, the Board noted:
> Even if it had been incumbent upon Wirtz to investigate the validity of Brau's claim to an extension, as General Counsel contends, he would have been confronted with the necessity of resolving the legal questions as to whether the extension agreement was still in force despite Brau's default on the required payments, and whether the receipt given by a secretary who did not have authority to modify the agreement, nevertheless, did modify the agreement.

Id. at 740. Cf. note 10 supra.

before the Board and this court indicates that further inquiry by Zoe would have been a formidable and quite possibly fruitless task. It is by no means improbable that Kalisky would have denied, as he did during the hearings, that the employees had ever made a timely tender. And even if Zoe could have resolved to its satisfaction from all of the conflicting evidence that a tender of dues had been made, it would still be faced with the complex legal issues considered by the hearing examiner and the Board: whether the employees were required to tender the initiation fees as well as the dues, whether the time for tender was extended by the arbitration decree, whether signing membership cards was a permissible requirement of union membership, to name only a few. To take the last issue as an example, the hearing examiner initially construed the arbitration award's direction to discharge employees "who have failed to join the union on or before Sept. 3," as requiring only payment of dues and fees, while the Board interpreted it to require the "employees to join the Union and pay dues and fees." If Zoe had interpreted the award in the same way as the Board, the fact that it thought it was properly complying with the letter of the subsequent court order might not in itself justify a violation of section 8(a) (3)— a mistake of law is no defense—but it does illustrate Zoe's plight. We do not think that an employer can fairly be held at his peril correctly to interpret the legality of a requirement such as signing membership cards, especially where, as

here, the statute is ambiguous, the past case law on the subject unclear,[17] and a state court has apparently deemed the requirement permissible and ordered the employer to proceed accordingly.[18]

We do not here rule on the correctnes of the Board's conclusion that requiring employees to sign these membership cards was impermissible, or on any of the other legal issues noted above. Whatever the proper answers may be, we do not think that the Act should be an obstacle course for employers. To stake an employer's liability on his resolution of such complex legal questions would be to go far beyond the reasonable purpose of the statute to prevent employers from docilely acceding to patently illegal union discharge demands. Thus, we hold only that the record before us fails to support the finding that Zoe had "reasonable grounds for believing" the discharge request improper or that the company was at fault in not conducting a further investigation into the dispute.

The Board's petition for enforcement of its order against Zoe is therefore denied. A further word is necessary regarding Local 803, against which the Board's petition is also brought. As already indicated, Local 803 has defaulted and has not appeared. Therefore, the Board's petition as to it would ordinarily be granted as a matter of course. However, the Board is apparently attempting to enforce successor liability against another union, which has filed an answer in this court both

---

17. Note that the cards solicited by Local 803 required the signer to do no more than to designate the union as majority representative, a status it already enjoyed under its collective bargaining agreement with Zoe, and to abide by the union's constitution and bylaws, which, according to the trial examiner, appear "to impose on employees no more than payment of $25 initiation fee and $5 monthly dues as obligations of membership * * *." We do not decide whether requiring membership on these facts would be contrary to NLRB v. General Motors Corp., 373 U.S. 734, 83 S.Ct. 1453 (1963). Cf. Union Starch & Refining Co., 87 N.L.R.B. 779

(1949), enforced, 186 F.2d 1008, 27 A.L.R. 2d 629 (7th Cir.), cert. denied, 342 U.S. 815, 72 S.Ct. 30, 96 L.Ed. 617 (1951).

18. It is interesting to note that the New York State Unemployment Compensation Board found, subsequent to the discharge, that the employees had quit work voluntarily, as they refused to join Local 803 in accordance with the union security agreement. While this determination has no influence on the Board's determination, it is another example of the singular lack of unanimity in deciding the issue of the validity of the membership card requirement.

denying such liability and attacking the validity of the underlying Board order against Local 803. We have refrained from deciding the latter issue, and the former is essentially a question of fact which should be decided by the Board in the first instance. Southport Petroleum Co. v. NLRB, 315 U.S. 100, 62 S.Ct. 452, 86 L.Ed. 718 (1942). The Board may insist on attempting to enforce successor liability [19] and may hold another union liable on that basis. Should that occur, we make clear that such union will have the right to litigate in this court the validity of the Board order against Local 803, since we have not decided that issue on the merits.

[19]. Since Local 803 notified Zoe in April 1964 that it had no further objection to rehiring the employees, its potential liability is limited.