**Hyman KALISH, Plaintiff,**

v.

**Harold A. HOSIER, I. M. Rosenblatt, Wallace J. Axelson, W. C. King, Jr., and Denver Mailers Union Number 8, Local of the International Mailers Union, Defendants.**

Civ. A. No. 8687.

United States District Court
D. Colorado.

Dec. 27, 1965.

---

Milnor H. Senior, Denver, Colo., for plaintiff.

Edward J. Fillenwarth, Indianapolis, Ind., and Philip Hornbein, Jr., Denver, Colo., for defendants.

## MEMORANDUM OPINION AND ORDER

ARRAJ, Chief Judge.

Plaintiff brings this action under the provisions of the Labor-Management Reporting and Disclosure Act of 1959, 29 U.S.C. § 401 et seq. This Court has jurisdiction pursuant to 29 U.S.C. § 412.

On October 1, 1963 the plaintiff was a member in good standing of defendant local union and defendant national union. He did not attend a regular monthly meeting of the local union held in October 1963. Section 76 of the by-laws of defendant local union provides, *inter alia*

"Local dues shall be ½ of one percent of total earnings a month with one dollar ($1.00) minimum plus $1.00. The one dollar to be rebated if the member answers roll call. No excuse shall be accepted other than a doctor's certificate of the member's illness, member working in an adjacent city or a member not actively engaged in the milling trade and living beyond a twenty-five (25) mile radius of the City of Denver  *  *  * "

In November 1963 plaintiff did not pay the additional one dollar provided by the above section. Thereafter he was denied the right to vote in union elections held on December 18, 1963, January 5, 1964 and January 8, 1964. The additional $1.00 to be rebated was a form of inducement to encourage members to attend the monthly meetings. The basis for plaintiff's refusal to pay the additional one dollar was his conclusion, allegedly fortified by a ruling of the National Labor Relations Board, that such an additional charge was, in reality, an

illegal fine and hence unenforceable. Plaintiff's action did not affect his employment relation or his right to attend and be heard in union meetings.

Subsequently, the plaintiff sought internal review of this action taken by the union. During the course of this review, the plaintiff alleges that a conspiracy was formed by the officers of the union to discourage these efforts and to injure the plaintiff in his quest to secure his rights claimed under the Labor-Management Reporting and Disclosure Act of 1959 (hereinafter referred to as LMR DA). As evidence of such conspiracy, the plaintiff testified about several incidents that occurred during this time between him and other members of the union, including some of the defendants. A majority of the other union members refused to talk to him, or otherwise associate with him. Defendant Axelson involved himself in an altercation with the plaintiff, and, although it was unclear as to who made the first contact, struck the plaintiff. On numerous occasions, various union members would blow smoke in the face of the plaintiff. Many of the other incidents that the plaintiff contends were acts arising from and forming a part of this alleged conspiracy appear to be nothing more than incidents of 'horseplay' common among all the workers at the place of employment. No purpose would be gained by describing the various 'pranks' that make up this activity; it is sufficient to point out that, at one time or another, practically *all* of the workers were the victims of one sort of a 'prank' or another of which the plaintiff here claims were acts of conspiracy against him.

The evidence established that the plaintiff's own conduct detracted from the good faith that he allegedly held throughout the entire time. His consistent refusal to cooperate with the officers in respect to the alleged illegal fine shows that he was more desirous of "setting up the union and its officers for a law suit" rather than effecting a settlement of the dispute that would be beneficial to both sides. It also appears from the evidence that, rather than being silenced in voicing his views concerning local union activities, plaintiff rejected every opportunity accorded him whereby he could make his voice heard. He refused to attend meetings although the floor was always open to him provided he discussed business that was properly before the meeting after gaining the floor in the proper manner. He was offered, and refused, the opportunity to serve as the Local's correspondent to the International's monthly magazine, "The Mailer". Sometimes when a malfunction occurred in the folding machine, plaintiff caused irritation among his fellow workers, by displaying in a braggadocio fashion, a button imprinted with the words "Bad Papers". At other times, in pantomime, the plaintiff would indicate, by a stirring gesture, that he was instigating trouble within the union. In addition, he openly supported, in a manner offensive to his fellow union members, another individual who was also involved in litigation with the International Mailer's Union in Pennsylvania. Such support was evidenced by another button worn by the plaintiff stating: "Win Sagot Win". Lastly, in response to a request from defendant Rosenblatt to meet with the union and settle the dispute over the alleged illegal fine, the plaintiff not only refused to attempt to reach a satisfactory settlement, but retorted with, " * * * there would be more." In sum, plaintiff's conduct with his co-workers and fellow union members was unpleasant, offensive and obnoxious; he invited his ostracism.

The issues before the Court for determination are basically two:

1. Was the additional one dollar assessed by the union an illegal fine?

2. Did the defendants engage in a conspiracy to harass and punish the plaintiff to discourage his efforts in contesting the action taken by the union; and, if so, what damages were suffered by the plaintiff?

The LMRDA provides for the protection of union members in their

856

relationship with the union. In enacting section 411, Congress provided for a union member's "Bill of Rights"; but also recognized the need of a union, as an organization, to provide for and enforce reasonable rules and regulations to insure the union's effectiveness, both internally and in its relationship with management. The legislative policy appears in the proviso to section 411, which states

" * * * nothing herein shall be construed to impair the right of a labor organization to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution * * *. 29 U.S.C. § 411(a) (2)"

and also appears in a proviso to section 158(b) (1) of the Taft-Hartley Act. There, in providing that a labor organization shall not restrain or coerce an employee in the exercise of his rights otherwise guaranteed by the National Labor Relations Act, Congress nevertheless specifically provided that a union shall have the right

" * * * to prescribe its own rules with respect to the acquisition or retention of membership therein * *."

The interpretation and implementation of such a legislative policy devolves primarily upon the National Labor Relations Board, bolstered by the enforcement authority of the Federal Courts. In applying this Congressional policy, there has developed the principle that a labor union may make rules, and enforce them through the process of levying fines, so long as such enforcement does not amount to a *condition of employment,* thereby violating 29 U.S.C. § 158(b) (1) (A). Stated another way, enforcement of internal rules becomes illegal and proscribed only when such enforcement results in interfering with the employment relation between the employee and his employer. NLRB v. Leece-Neville Co., 330 F.2d 242 (6th Cir. 1964) enforcing an order issued in Leece-Neville and Int'l Bro. of Electrical Workers, 140 NLRB 56 (1962). See Minneapolis Star & Trib-

une Co., 109 NLRB 727 (1954) where the Board stated

"Congressional recognition of a labor organization's right to make its own rules presumes, of course, its right to invoke them—except where the implementing of such rules is expressly prohibited, as in the case of affecting an employee's employment rights." Id. at 728.

An examination of the facts of the case at bar discloses that at no time was the plaintiff's status as an employee placed in jeopardy. Throughout the entire period, including the trial, he was continued to be employed at the Denver Post. Although he testified that he was fearful that he was going to be fired, there was no other showing that his employment was in the process of being terminated. Since his employment is not in jeopardy because of his refusal to pay the additional one dollar, the action of the union in levying the assessment appears to be a proper form of internal regulation protected by the LMRDA, hence not an illegal fine.

█ In reference to the plaintiff's contention that the defendants formed a conspiracy to harass, punish, discourage, and vilify him, the evidence adduced at trial wholly failed to support such a position. It is true that some of the incidents referred to were visited upon the plaintiff. But that they were all part of a conspiracy formed against the plaintiff would be a conclusion based solely on conjecture and surmise. Rather than being acts arising from, and in furtherance of, a conspiracy, the real reason that prompted such acts of the members as well as some of the defendants was their personal disdain for the conduct of the plaintiff, both in relation to his dispute with the union as well as his attitude and working habits in general. The entire factual setting portrays a situation where a man, involved in a dispute with his union, incurred the disrespect and contempt of a majority of his fellow union members. It would be pure speculation for this Court to say that there was a conspiracy formed by these defendants

for the purpose of discrediting the plaintiff and denying him his rights guaranteed by the LMRDA. The record is devoid of any showing of concerted activities by these defendants to injure the plaintiff. Contrary to his contention, the evidence does not disclose that these defendants used their positions of union leadership to encourage or coerce the rank and file members to shun or avoid the plaintiff. The members, independent of any direction or coercion, concluded that they would rather disassociate themselves from the plaintiff.

■ It may be fairly stated that from the evidence it appears that a claim or claims sounding in tort may be available to the plaintiff. But the requisite jurisdiction is lacking for this Court to render an award of damages based on apparent tortious interference with the plaintiff's person and reputation. The jurisdiction of the Federal Courts secured by the LMRDA over disputes arising out of a working man's relationship with his union is indeed limited in scope. It was not the intention of Congress to elevate every dispute of this nature to one which could be judicially determined in a Federal Court. In Tomko v. Hilbert, 288 F.2d 625 (3rd Cir. 1961), after examining the legislative history of the LMRDA with specific reference to the question of the extent of the jurisdiction of the Federal Courts under that Act, the Court stated

> Private misconduct which incidentally may frustrate appellant's rights as a union member does not give rise to an action under the bill-of-rights section. * * * [I]t certainly was never the intention of Congress to open the federal courts to the adjudication of ordinary tort claims merely because the conduct occurs in a union hall * * * and none, one, or all of the participants are union members. Could a simple assault and battery on a union member arising out of a personal feud be vindicated under the bill-of-rights section merely because it occurs at a union meeting? We think the answer is obvious. The state courts remain open to the appellant. Rights and remedies

that he may have under state law have not been pre-empted or affected by passage of the bill-of-rights section of the LMRDA. Id. at 629.

Having determined that the injuries complained of by the plaintiff were not the product of conspiratorial acts of the defendants, the LMRDA is insufficient to confer jurisdiction over this controversy. It is clear that diversity of citizenship between the plaintiff and all of the defendants is lacking. See United Steel Workers of America, AFL–CIO v. Bouligny, Inc., 382 U.S. 145, 86 S.Ct. 272, 15 L.Ed.2d 217 (1965). Furthermore, there is no federal question presented here that would permit invoking this Court's jurisdiction. Under the evidence adduced, we are without authority to grant the plaintiff the relief he seeks. He must look elsewhere for redress.

Inasmuch as this Memorandum contains a statement of the facts as found by the Court and the Court's conclusions thereon, no formal Findings of Facts and Conclusions of Law need be entered.

Judgment will be entered for defendants and against plaintiff. Counsel for defendants will prepare and submit an appropriate form of judgment.