Robert GUNTER, et al., Plaintiffs,

v.

**ATOMIC PROJECTS AND PRODUCTION WORKERS METAL TRADES COUNCIL, and Sandia Corporation d/b/a Sandia National Laboratories, Defendants.**

**No. CV 93–0924 LH/LFG.**

United States District Court,
D. New Mexico.

Feb. 21, 1997.

Mickey D. Barnett, Albuquerque, NM, Hugh L. Reilly, Springfield, VA, for Plaintiffs.

Gerald R. Bloomfield, Albuquerque, NM, Victoria L. Bor, Washington, DC, Mark D. Schneider, Upper Marlboro, MD, James Marshall Piotrowski, Albuquerque, NM, for Defendant Atomic Projects and Production Workers Metal Trades Council.

Timothy L. Salazar, Albuquerque, NM, George Cherpelis, Albuquerque, NM, Jeffrey Scott Landers, Albuquerque, NM, for Sandia Corp.

### MEMORANDUM OPINION

HANSEN, District Judge.

This case is before the Court on cross motions for summary judgment. The Atomic Projects and Production Workers Metal Trades Council ("MTC" or "the Council") is a labor organization formed by eleven unions that represent various crafts at the Sandia National Laboratories ("Sandia"). Sandia recognizes the MTC as the exclusive representative of employees working in the crafts represented by these eleven unions. Sandia and the Council are parties to a collective bargaining agreement ("CBA") which contains an agency shop clause (Article 39 of the CBA). This agreement was effective from October 1, 1990 to September 30, 1993.

The bargaining-unit employees belong to, or pay fees to, eleven different labor unions ("the affiliated unions"), each of which primarily services a particular trade, and has jurisdiction over certain job classifications at Sandia. Otero Decl., ¶¶ 7 and 8.

This matter concerns the interpretation, application and enforcement of the CBA. Thirty-eight employees of Sandia ("the Employees" or "Plaintiffs"), who are not members of the MTC, have brought this action.

This Memorandum Opinion addresses only the summary judgment arguments raised by and between MTC and the plaintiffs.

The Court heard oral arguments in this matter and has reviewed MTC's Motion for Summary Judgment (Docket No. 136), Plaintiffs' Motion for Summary Judgment and Cross Motion for Summary Judgment (Docket No. 147), as well as all memoranda and supplemental materials submitted by the parties. For the reasons contained in this Memorandum Opinion, MTC's Motion for Summary Judgment will be granted and Plaintiffs' Motion and Cross Motions will be denied. Defendant Sandia's Motion for Summary Judgment (Docket No. 138) is granted and Plaintiffs' Cross Motion (Docket No. 145) will be denied.

## I. BACKGROUND

The Complaint alleges that, as the Employees' exclusive representative for collective bargaining with Sandia over their wages, hours, terms and conditions of employment, the Council owes them the fiduciary duty of fair representation, and that this duty has been breached (Count I).[1] The Employees next allege a cause of action against Sandia for its alleged participation in the Council's breach of this duty (Count II). Finally, the Employees allege that the negotiation and, more importantly, the enforcement of the agency shop provision, violates the CBA (Count III).

MTC has set forth the following facts in its pleadings which have been undisputed by the Employees, unless otherwise indicated by footnote. Accordingly, these facts are accepted by this Court as true:

The CBA contains an agency shop clause under which, as a condition of employment, each employee who is not a member of the council must "pay or tender to the Council amounts equal to an agency fee determined by the appropriate affiliated Union of the Council and by the Council in a manner required by law...." The dues or fees employees pay pursuant to the contractual agency shop clause are composed of a portion payable to the Council, and a portion payable to the appropriate affiliated union. The amount paid by Sandia employees varies, depending on the dues structure established by the respective union.

In 1990, the Council adopted and publicized a policy which advised nonmembers of their right to refrain from financially supporting certain Council activities for union activities which are not "reasonably related" to collective bargaining, and of its procedure for their assertion of that right and for filing objections. Otero Declaration, ¶ 11.

The notice explained that nonmembers who wanted to exercise their rights under *Communications Workers of America v. Beck*, 487 U.S. 735, 108 S.Ct. 2641, 101 L.Ed.2d 634 (1988) should notify the Council in order to be charged a reduced agency fee. Otero Declaration, ¶ 11.

All of the plaintiffs in this action filed objections with the Council. Although the policy provided that, upon objection, they would be charged a reduced fee, most of them completely stopped paying fees to the Council. *Id.* at ¶ 13.

In January 1992, the Council provided objectors with additional notice of the policy, along with financial information explaining the basis for the reduced fee being assessed.[2] *Id.* ¶ 16.

On or about May 4, 1993, the Council provided objectors with another copy of the notice (Ex. C to Otero Declaration), along with additional financial information support-

---

1. The Employees allege that the Council breached these duties in many respects. First, they allege that the Council breached its duty by negotiating an agency shop provision that states the financial obligations of nonmembers in terms of paying amounts equal to the "periodic dues" applicable to members. Complaint ¶ 15A. Further, Employees contend that the Council breached its duty by issuing defective disclosure and affiliate statements to them. *Id.* at ¶¶ 15B

and C. Finally, they contend that the duty of fair representation requires that the Council not threaten or demand the discharge of employees from employment while it is in default of the obligations previously mentioned in this footnote. *Id.* At ¶ 15D.

2. The Employees dispute the sufficiency of the financial information provided.

ing the reduced fee.[3] Included were letters which specified the amount each objector was being assessed and the basis for calculating the assessment, and advised the objectors that failure to pay by June 4, 1993, would subject them to discharge under the agency shop clause. *Id.,* ¶¶ 18–21 and Exhibit D.

The 1990, 1992 and 1993 policies offered objectors the opportunity to have disputes over the adequacy of the fee resolved by an arbitrator. Otero Declaration ¶¶ 11, 12, 16, 18 and Ex. C.[4]

In response to the May 4 letters, thirty-four of the plaintiffs to this action paid their fees, under protest. Otero Declaration ¶ 25. This money has been placed in an escrow account, pending resolution of this matter.

None of the plaintiffs invoked the arbitration procedure under the plan before filing this lawsuit. *Id.,* ¶ 32.

The MTC demanded, verbally and in writing, that those Employees who had not paid dues be discharged by Sandia. On June 30, 1993, Sandia conducted a meeting of "*Beck* objectors, to advise Employees that they would be discharged if they did not pay the fees demanded by MTC," because Sandia was bound by Article 39 of the CBA, and because their dispute was with the Council and not with Sandia. Four Employees, Esquibel, Farina, Gunter and Woody were separated from employment because they declined to pay fees demanded by MTC. Farina took "early retirement". Sandia offered Esquibel, Gunter and Woody reinstatement in November 1993. Esquibel and Woody were reinstated to employment

as of December 6, 1993. Gunter waived reinstatement and back-pay. Otero Declaration, ¶¶ 26–31.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). However, Rule 56 is not a requirement that the moving party negate his opponent's claim. *Fitzpatrick v. Catholic Bishop of Chicago,* 916 F.2d 1254, 1256 (7th Cir.1990). Rule 56 mandates the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and in which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The standard for granting summary judgment mirrors the directed verdict standard under Rule 50(a), which requires the court to grant a directed verdict where there can be but one reasonable conclusion. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). A scintilla of evidence in support of the non-moving party's position is not sufficient to successfully oppose summary judgment; "there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 2512, 106 S.Ct. at 2512. No genuine issue for trial exists "where the record as a whole

---

**3.** Exhibit E to the Otero Declaration is a copy of the financial report which was provided to all objectors to support the reduced fee for 1993, showing the break-down of chargeable and non-chargeable ·expenditures of the Council for the 1992 calendar year. Exhibit F to this declaration is a copy of the financial report which was provided to those objectors who owed fees to the IBEW, to support the reduced IBEW fee for 1993, and which shows the break-down of the chargeable and nonchargeable expenditures of the IBEW and IBEW Local 1988 for the fiscal year July 1, 1991, through June 30, 1992. Exhibit G to this declaration is a copy of excerpts of the financial report which was provided to those objectors who owed fees to the IAM, to support the reduced IAM fee for 1993, and which shows the breakdown of the IAM's chargeable and non-

chargeable expenditures for the 1992 calendar year.

**4.** The Employees dispute MTC's statement that these policies were "substantially identical." Employees contend that the policies vary as to categories of activities the International Association of' Machinists claimed were chargeable under *Beck.* They also deny that "any dispute over the adequacy of the fee determination" was covered, as those disputes were, under the policy confined to "challenges to the expenditures." The Employees also deny that "neutral arbitration" was offered, as there is no provision for the Employees to participate in the selection of the arbitrator.

could not lead a rational trier of fact to find for the nonmoving party." *Juarez v. Ameritech Mobile Communications, Inc.*, 957 F.2d 317, 322 (7th Cir.1992)(quoting *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986)).

Because no genuine issue of material fact exists in the case at hand, the Court can decide the motions for summary judgment as a matter of law.

## III. MOTIONS FOR SUMMARY JUDGMENT BETWEEN MTC AND EMPLOYEES

### A. DUTY OF FAIR REPRESENTATION

The Employees allege in their Complaint that MTC has breached its duty of fair representation in two material respects. First, they allege that MTC breached its duty by negotiating an agency shop that states the financial obligations of nonmembers in terms of paying amounts equal to the "periodic dues" applicable to members. Complaint ¶ 15A. Second, they contend that the duty was breached by the issuance of a defective disclosure statement. Complaint ¶¶ 15B and 15C.

■ A union's duty of fair representation is a judicially implied duty which arises from Sections 8(b) and 9(a) of the National Labor Relations Act of 1935 ("NLRA"), 29 U.S.C. §§ 158(b), 159(a) (1988). *Breininger v. Sheet Metal Workers Local 6*, 493 U.S. 67, 110 S.Ct. 424, 107 L.Ed.2d 388 (1989). This duty requires a union to "represent fairly the interests of all bargaining-unit members during the negotiation, administration and enforcement of collective-bargaining agreements," *International Broth. of Elec. Workers v. Foust*, 442 U.S. 42, 47, 99 S.Ct. 2121, 2125, 60 L.Ed.2d 698 (1979), and is breached "only when a union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith." *Vaca v. Sipes*, 386 U.S. 171, 190, 87 S.Ct. 903, 916, 17 L.Ed.2d 842 (1967).

Section 8(a)(3) of the NLRA, 29 U.S.C. § 158(a)(3) (1988), "permits an employer and an exclusive bargaining representative to enter into an agreement requiring all employees in the bargaining unit to pay periodic union dues and initiation fees as a condition of continued employment, whether or not the employees otherwise wish to become union members." *Communications Workers of America v. Beck*, 487 U.S. 735, 738, 108 S.Ct. 2641, 2645, 101 L.Ed.2d 634 (1988).

The Act explicitly allows unions and employers to negotiate contract clauses "requir[ing] as a condition of employment membership" in the union, 29 U.S.C. § 158(a)(3), so long as an employee is required to do no more than "tender the periodic dues and the initiation fees uniformly required...." *Id.*

It is well established that causing or attempting to cause an employer to discharge an employee for breach of any union membership requirements other than failure to pay the financial core obligations of uniform initiation fees and dues violates the Act, specifically sections 8(b)(2) and 8(b)(1)(A). *See Union Starch & Ref. Co.*, 87 NLRB 779, 787 (1949), *enforced*, 186 F.2d 1008 (7th Cir.), *cert. denied*, 342 U.S. 815, 72 S.Ct. 30, 96 L.Ed. 617 (1951).

In *Beck*, the Supreme Court established that a labor organization violates the duty of fair representation's prohibitions on "hostile" or "discriminatory" action against represented employees by collecting or exacting fees for purposes other than "collective bargaining, contract administration or grievance adjustment." *Id.* at 739–40, 108 S.Ct. at 2646; at 759, 108 S.Ct. at 2655–56. *Beck* held that § 8(a)(3) of the NLRA, 29 U.S.C. § 158(a)(3) authorizes the "exaction of only those fees and dues necessary to 'performing the duties of an exclusive representative of the employees in dealing with the employer on labor-management issues.'" *Id.* at 762–63, 108 S.Ct. at 2657 (quoting *Ellis v. Railway Clerks*, 466 U.S. 435, 448, 104 S.Ct. 1883, 1892, 80 L.Ed.2d 428 (1984)). Thus, bargaining for and entering into agreements which call for payments to support union activities beyond those germane to collective bargaining were found to be violative of the union's duty of fair representation. *Id.* at 745, 762–63, 108 S.Ct. at 2648, 2657–58.

### 1. Facial Validity Issue

 An "agency shop agreement" is one that requires every employee in the collective bargaining unit, whether union or nonunion, to pay a fee to help defray the costs of collective bargaining and contract administration. The Supreme Court sanctioned the agency shop agreement concept in *Abood v. Detroit Bd. of Ed.*, 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977). Since 1982, the parties' collective bargaining agreement has contained an agency shop clause. The language of this clause provides that all union members in the unit "shall, as a condition of employment ... pay or tender to the Council amounts equal to the periodic dues uniformly required as a condition of acquiring or retaining council membership...." Otero Decl. ¶ 6 and Exhibit A. The clause further provides that

> Each member who is not a member of the Council, shall, as a condition of employment with the Laboratories, pay or tender to the Council amounts equal to the agency fee determined by the appropriate affiliated Union of the Council and by the Council in a manner required by law....

*Id.*

The Employees' Complaint alleges that, in violation of its duty of fair representation, MTC has negotiated and enforced a provision in the CBA which states that employees must pay periodic dues as a condition of their employment with Sandia and which otherwise misrepresents employees' obligations to the Council. Complaint, ¶ 16A. In their brief, the Employees argue that the dues provisions are unlawful on their face, citing *Beck, supra,* and *Bloom v. N.L.R.B.*, 30 F.3d 1001 (8th Cir.1994) in support of this contention.

 *Beck* holds that a union may not enforce a union security clause by charging nonmembers the equivalent of full dues. *Beck*, 487 U.S. at 747–52, 108 S.Ct. at 2650–52. To protect themselves from discharge pursuant to a union security clause, employees need only pay that portion of union dues and fees attributable to the union's representational activities. *Id.* at 752, 108 S.Ct. at 2652.

The right of non-union employees to object to full dues payment under *Beck* does not, however, lessen their general obligations under normal union-security clauses. In this regard, the *Beck* decision follows the Supreme Court's earlier Railway Labor Act decisions, which hold that the right of bargaining-unit employees to object to full dues payments does not invalidate normal union security clauses requiring such payments. *International Ass'n of Machinists v. Street*, 367 U.S. 740, 771, 81 S.Ct. 1784, 1801, 6 L.Ed.2d 1141 (1961) ("the union Shop agreement itself is not unlawful"); *Railway Clerks v. Allen*, 373 U.S. 113, 120–121, 83 S.Ct. 1158, 1162–63, 10 L.Ed.2d 235 (1963) (employee "grievance stems from the spending of their funds for purposes not authorized by the Act in the face of their objection, not from the enforcement of the union-shop agreement" itself); *Ellis v. Railway Clerks*, 466 U.S. 435, 439, 104 S.Ct. 1883, 1887, 80 L.Ed.2d 428 (1984) (while plaintiffs object to use of compelled dues for specified union activities, they "do not contest the legality of the union shop as such, nor could they").

*Bloom* does not support the facially invalid argument either. *Bloom* involved a situation where the union security clause required covered employees "to become and remain members in good standing in the Union." Unlike this case, in *Bloom*, the union *did not apply that clause in a lawful manner.* Rather, the union advised Bloom that if he did not complete the membership application and dues checkoff card, that he would be terminated. The Eighth Circuit held that "[b]ecause the overly broad union security clause was *unlawfully interpreted and applied,* an adequate remedy in this case requires expunction of the offending clause." *Id.* at 1005 (emphasis added).

MTC points out that the same attorney who represents the Employees here, made similar arguments and challenges to a union-security provision on behalf of employees represented by the Electrical Workers in the case of *International Union of Electronic, Elec., Salaried, Mach. and Furniture Workers, AFL–CIO v. N.L.R.B.*, 41 F.3d 1532 (D.C.Cir.1994).

In that case, the clauses were held to be facially valid:

> Contrary to [plaintiff's] claim, *Pattern Makers [League of North America v. N.L.R.B.*, 473 U.S. 95, 105 S.Ct. 3064, 87 L.Ed.2d 68 (1985)]* and *Beck* in no way compel the conclusion that union-security agreements . . . are unlawful on their face. *Beck* speaks only to the level of dues an employee may lawfully be required to pay under a union-security agreement. *Pattern Makers* stands only for the proposition that unions may not require full union membership as a condition of employment and may not restrict an employee's right to resign from full membership in the union. Neither case has anything to do with what language is permissible in a union-security agreement, and, as such, neither case supports [plaintiff's] claim. Furthermore, there is absolutely nothing in the record of this case to indicate that the Union has ever required full membership as a condition of employment or that the Union has ever exacted from unwilling unit employees sums unrelated to the Union's representational and collective bargaining activities.

*Id.* at 1539.

Likewise, in this case, there is nothing in the record to indicate that the MTC has ever required full union membership as a condition of employment or that the MTC has ever exacted sums unrelated to representational and collective bargaining activities. Use of this agency shop language does not constitute "arbitrary, discriminatory or bad faith" conduct, *See Vaca v. Sipes*, 386 U.S. 171, 190, 87 S.Ct. 903, 916, 17 L.Ed.2d 842 (1967), and I conclude it does not constitute a violation of the duty of fair representation.

5. *Chicago Teachers Union, Local No. 1, AFT, AFL–CIO v. Hudson*, 475 U.S. 292, 106 S.Ct. 1066, 89 L.Ed.2d 232 (1986) *("Hudson III"); See also Hudson v. Chicago Teachers Union, Local No. 1*, 699 F.Supp. 1334 (N.D.Ill.1988)(*"Hudson IV)"*; and *Hudson v. Chicago Teachers Union, Local No. 1*, 922 F.2d 1306 (7th Cir.1991) (*"Hudson V"*).

6. Here, no state action is involved and there are thus no constitutional concerns which warrant the safeguards found necessary in *Hudson*. The

## 2. *Disclosure Statement Provided to Employees*

The Employees contend that MTC has breached its duty of fair representation by issuing a defective disclosure statement to them. They cite to the *Hudson*[5] line of cases as the only real source of procedural standards for the exaction and collection of fees from nonmembers by a labor organization. *Hudson* enunciates three "constitutional requirements" that must be met where the First Amendment governs the collection of compulsory fee payments:

> (i) an adequate explanation of the basis for the fee; (ii) a reasonably prompt opportunity to challenge the amount of the fee before an impartial decision maker, and (iii) an escrow for the amount reasonably in dispute while such challenges are pending.[6]

*Hudson III*, 475 U.S. at 310, 106 S.Ct. at 1078. The second and third of these requirements have been met in this case, and effectively conceded by the Employees: MTC accorded them an opportunity to challenge the fee before a neutral arbitrator, and to have their fees held in escrow while any challenge was pending.

What remains at issue is the notice procedure. The *Hudson* progeny has held that the purpose of this procedure is limited; "it only had to give the plaintiffs enough information to evaluate the accuracy of the fee so that they could determine whether they wanted to challenge the fee." *Hudson V*, 922 F.2d at 1309. Thus, it is incumbent upon this Court only to determine whether Employees had enough information to enable them to decide whether or not to object. As noted by *Hudson IV*, if it had been intended for federal courts to scrutinize meticulously the accuracy of the fee, it would not have

Court has found the *Hudson* framework to be a helpful one however, and because the Court ultimately concludes that even this higher standard has been met by MTC, in sections of this Memorandum Opinion the Court will utilize the *Hudson* analysis. At the "bottom line", the Court is aware that it is necessary only that the procedures employed not be arbitrary, discriminatory, or implemented in bad faith. *Sipes*, 386 U.S. at 190, 87 S.Ct. at 916.

required the union to establish its own internal procedure for resolving fee disputes. *Id.* at 1340.

On remand, the *Hudson* district court ultimately upheld the union's notice, which broke down agency fees into its component parts, revealed its direct method of cost allocation, and provided for the internal objection procedure within the Court's requisites for escrow deposits and a neutral decision maker. *See Hudson IV*. The Court rejected the argument that the disclosure had to explain the rationale for the underlying assumptions employed in calculating the fee and concluded that the mere disclosure of these underlying assumptions performed the constitutional function of enabling the plaintiffs to assess the propriety of the fee. *Id.* at 1340. It also rejected the plaintiffs' complaint that the notice lacked detailed breakdowns of activities and costs. The court noted the Supreme Court's prior statement that the union " 'need not provide nonmembers with an exhaustive and detailed list of all its expenditures.' Instead of mandating a notice filled with painstaking detail, [the union must] 'include the major categories of expenses.' " *Id.* at 1341 (alteration in original) (citation omitted)(quoting *Hudson III*, 475 U.S. at 307 n. 18, 106 S.Ct. at 1076 n. 18).

*Hudson IV* explained that the notice procedure could pass muster "without necessarily guaranteeing the accuracy of the fee."[7] *Id.* at 1340. The Employees in this case argue that to provide "adequate disclosure," the system must include the major categories of expenses and "justify" the chargeable expenditures. I read the Employees' challenge as equating the adequacy of the notice with the accuracy of the fee assessment.

As noted by *Hudson V*, this is unreasonable:

Taken in its entirety, plaintiffs' challenge asserts that a prior hearing and prior judicial determination of the correctness of a ... fee is a precondition to the collection of the fee. Requiring the federal courts to micro-manage the fee calculation in every case challenging a union's ... fee would place an overwhelming and unrealistic burden on the courts.... *Hudson* did not contemplate that federal courts would be required, on the basis of the notice, to pass on the legality and accuracy of every element of the fee calculation before any fees could be collected.

922 F.2d 1306, 1314.

*Hudson III* forbids "[l]eaving the nonunion employees in the dark about the source of the figure for the agency fee...." *Id.* at 306, 106 S.Ct. at 1076. The Court stated that the explanation of the fee must "identify[ ] the expenditures for collective bargaining and contract administration that [are] provided for the benefit of nonmembers as well as members—and for which nonmembers as well as members can fairly be charged a fee...." *Id.* at 306–07, 106 S.Ct. at 1076. It added that this is a "limited notice requirement" that should not impose an "undue burden on the union," and specified that the union "need not provide nonmembers with an exhaustive and detailed list of all its expenditures." *Id.* at 306 n. 17 and 307 n. 18, 106 S.Ct. at 1076 n. 17 and n. 18. In this regard, the Court explained that "adequate disclosure surely would include the major categories of expenses, as well as verification by an independent auditor." *Id.* at 307 n. 18, 106 S.Ct. at 1076 n. 18.

■ With this guidance and the *Sipes* standards in mind, I will review the disclosure procedures in the instant case.

### (a) Major Categories of Expenses

Each year MTC has provided each represented nonmember with a notice explaining that nonmembers have the right to file an objection and to pay only the collective bargaining portion of the normal agency fee. This notice informs these employees of (i) the types of expenditures that are classified as chargeable to objectors[8] and the types that

---

7. To address nonmembers' challenges to the accuracy of the fee, *Hudson* mandated that the union provide a reasonably prompt opportunity for the resolution of disputes by an impartial decision maker.

8. The notice lists, as examples of chargeable expenditures. "those relating to negotiations with employers, enforcing collective bargaining agreements, informal meetings with employer representatives" and the like. Ex. C at 2.

are classified as non-chargeable; and (ii) the approximate portion of union expenditures in each category, so that the employee is able to estimate that amount of the advance reduction payment he or she would receive upon objecting. The notice spells out the procedure nonmembers may use to exercise their objection rights. Nonmembers who wish to object need to notify the Council in writing, during a specified period, they need not explain the basis for their objection. The fees paid by employees filing such objections are reduced for the following year to reflect the portion of overall expenses which the Council and the affiliated union with jurisdiction over the objector's job spend on "chargeable" activities. Objectors are provided with an explanation of the basis for the reduced fee. The stated policy further provides that any objecting member who disagrees with the reduction may challenge it before an impartial arbitrator, and that the disputed fees will be held in escrow while the challenge is resolved. Ex. C, at 2–3. The notice further explains that objectors will be given a full explanation of the calculation of the fee reduction and an opportunity to challenge that calculation in arbitration. Finally, the notice explains when and how to file an objection. *See* Otero Declaration, Ex. C.

Nine of the eleven affiliated unions opted to forego their right to collect agency fees from the nonmembers in their units, rather than incur the substantial expense associated with documenting their chargeable and non-chargeable expenditures. Objecting nonmember employees of these unions pay only the reduced fee charged by the MTC, because their respective affiliated unions have not done the necessary accounting. Two of the Unions—the IBEX and the IAM—prepared financial analyses of their overall expenditures, and based upon these reports, charged reduced agency fees to their nonmembers. Otero Declaration, ¶ 23.

When the MTC advised the plaintiffs of their reduced fee, it provided them with financial information. To justify its own portion of the reduced fee, the MTC provided a financial report prepared by CAP Jerome Groebner (Otero Declaration, Ex. E). Mr. Groebner performed services which provided a basis for assuring that the expense allocation was reasonable. (Benis Declaration, ¶¶ 43–44). The MTC set forth the organization's total expenditures for the year; the breakdown between "chargeable" and "non-chargeable" expenditures; and the overall percentage of the expenditures which the organization spent on activities for which it could charge objecting nonmembers. The organizations utilized different approaches in producing their *Beck* audits.[9]

The MTC provided fee objectors working within IAM's jurisdiction with an audit of IAM's finances (Otero Declaration, Ex. G). In this regard, IAM retained a law professor, Roger Hartley, who made determinations regarding the chargeability of various expenditures, and extensively tested the accuracy of the reported expenditures. Hartley's audit was done in a manner consistent with standards established by the American Institute of Certified Public Accountants (AICPA), including maintaining his "independence", as that term is understood within the accounting profession (Benis Declaration, ¶¶ 8, 28–38).

Fee objectors working within the IBEW's jurisdiction were provided a Statement of Chargeable and Nonchargeable Expenditures ("Expense Audit") to support its reduced fee, which was prepared by an accounting firm, Thomas Havey & Company. (Otero Declaration, Ex. F). Havey's audit conformed to AICPA standards and supported the statement that it "presents fairly, in all material respects," the union's allocation of chargeable and nonchargeable expenses. (Benis Declaration, ¶¶ 8, 10–27).

*Popejoy v. New Mexico Bd. of Bar Com'rs*, 831 F.Supp. 814, 820 (D.N.M.1993) states that "precedent requires Defendants to topically categorize expenditures by amount spent and to allocate these expenditures into chargeable and nonchargeable activities so that a [dues paying] member has sufficient information to decide whether to object," cit-

---

9. For purposes of this litigation, the parties have agreed to focus on a single year's calculations and disclosures.

*ing Hudson III and Dashiell v. Montgomery County, Md.,* 925 F.2d 750 (4th Cir.1991).

Based upon what is before it in the record, the Court concludes that MTC's disclosure is reasonable and adequate to provide a potential objector with sufficient information to decide whether to object. Furthermore, the accounting of expenditures, broken down into chargeable and nonchargeable categories, was presented to objectors sufficiently in advance of the dues obligation so that they have a reasonable period of time in which to make an objection. *See Popejoy, supra,* 831 F.Supp. at 817.

### (b) Verification by Independent Auditor

As noted above, *Hudson III* states that disclosure of major categories of expenses must be made, with "verification by an independent auditor." *Id.* at 307 n. 18, 106 S.Ct. at 1076 n. 18.

The undisputed facts here indicate that MTC enlisted Jerome Groebner, CPA, to prepare a compilation report. He reviewed its records, made judgments about whether the expenses were properly classified, consulted representatives of the NLRB regarding the appropriate scope of his review, and recommended to the MTC that it adjust its records. In Dr. Benis' opinion, Groebner performed a sufficient review to be satisfied that the MTC expense allocation was reasonable. Benis Declaration, ¶ 44. Plaintiffs present no proof that any of MTC's expenditures were incorrectly allocated by Groebner.

The IBEW's auditors, Thomas Havey and Company, audited the union's chargeable and nonchargeable expenditures in accord with the Generally Accepted Auditing Standards.

The Employees complain that determination of chargeable and non-chargeable portions of the exactions made under the Dues Provisions for MTC's portion of the fee are not audited. They also complain that determination of chargeable and non-chargeable portion of exactions made under the Dues Provisions for the IBEW is not "verified" through adequate testing. Both of these concerns will be addressed together by the Court.

In support of their contention that the "verification" provided by MTC was inade-

quate under the *Hudson* standard, the Employees argue that the reviews performed on behalf of the MTC, IBEW and IAM did not satisfy relevant accounting principles, and that the auditors failed to "verify" that the expenditures were properly *categorized* as chargeable or nonchargeable. The Court in *Price v. International Union, et al.,* 927 F.2d 88, 93 (2d Cir.1991) noted that it was "not persuaded ... the Union's duty of fair representation is breached by the failure to have an independent auditor review the Union's *decision* as to what is chargeable and nonchargeable activity." (emphasis added).

Even in a constitutional context, that same Court stated in *Andrews v. Education Ass'n,* 829 F.2d 335 (2d Cir.1987), that *"Hudson* requires only that the usual function of an auditor be performed, i.e., to determine that the expenses claimed were in fact made." An independent auditor is not required to make the *legal determination* as to that which is chargeable and that which is not in order to satisfy the requirements of *Hudson. See Dashiell v. Montgomery County, Md.,* 925 F.2d 750 (4th Cir.1991), *reh. and reh. en banc denied* (1991). Nor is it the auditor's role to make legal determinations regarding the appropriateness of the allocation. *See Mitchell v. Los Angeles Unified School Dist.,* 744 F.Supp. 938, 940–41 (C.D.Cal.1990). As noted by *Hudson IV,* the plaintiffs' proposed interpretation of appropriate auditor's duties would "usurp" the function of the independent decision maker: "determining which union expenses are properly chargeable to nonunion employees." *Hudson IV,* 699 F.Supp. at 1341. Where, as here, MTC's figures can be subsequently reviewed by an independent arbitrator, I perceive no basis to infer irrationality or bad faith in the use of the procedures employed by MTC and conclude that nothing about the disclosure statement violates MTC's duty of fair representation.

### 3. Calculation of Reduced Fees

The Employees contend that MTC has breached its duty of fair representation with a calculation of reduced fees which is defective.

## (a) Arrbitration

■ MTC contends that the challenge of its duty of fair representation is premature under *Reid v. Int'l. Union, U.A.W.*, 479 F.2d 517 (10th Cir.), *cert. denied*, 414 U.S. 1076, 94 S.Ct. 592, 38 L.Ed.2d 483 (1973), because MTC has not required the plaintiffs to accept any fee calculation. Rather, MTC argues that it has offered to submit the calculation to review by an independent third party and to hold the plaintiffs' fee payments in escrow while that review proceeds. MTC argues that it has not engaged in arbitrary or outrageous conduct by offering the Employees the option of arbitration. MTC argues that it has factually demonstrated that the arbitration system and other procedural protections provided are far more protective of nonmember rights than those at issue in *Reid*, which MTC argues compels judgment for it.

In *Reid, supra*, the disputed union provision stated that any member could object to expenditure of his dues for political causes or activities. *Id.* at 518–19. If dissatisfied with the proportional allocation or the disposition of his objection, the objector was provided with appeal rights to a review board of nonunion personnel. *Id.*

Employees do not take issue with any of defendants' factual representations as to the arbitration and other procedures available to them. They merely assert that arbitration of *Beck* disputes cannot be compelled where there is no agreement to arbitrate.

Like the Court in *Reid*, I am not impressed by the Employees' attacks on the remedy which the union has provided. *See Reid* at 520. In *Reid*, no contract required arbitration; it was a provision of the union constitution. Here, the notice and disclosure to potential objectors offered this alternative.

As in *Reid*, no Employee has tried to utilize the arbitration procedure. I do not know how well it will work in actual practice. I am not confronted with any dispute over its

application or operation. The issue before the Court is whether the record supports a claim of unfair representation. I find no facts in the record to establish discrimination, fraud or dishonest, nor are there sufficient statements in the record to create an issue of fact. *Bumgarner v. Joe Brown Company*, 376 F.2d 749, 750 (10th Cir.1967), *cert. denied* 389 U.S. 831, 88 S.Ct. 99, 19 L.Ed.2d 90 (1967), *cited in Reid, supra*.

Having concluded in favor of MTC on this issue, it is now unnecessary to address its argument of whether or not exhaustion of union remedies is a prerequisite to court action. *See Reid* at 520. This conclusion is buttressed by the rationale in *Lancaster v. Air Line Pilots Ass'n. Intern.*, 76 F.3d 1509 (10th Cir.1996). In that case, the Tenth Circuit recently addressed whether a dissenting employee must exhaust all available nonjudicial remedies, provided those remedies are adequate under the criteria established by the Supreme Court. The *Lancaster* Court reiterated its general agreement with the Seventh Circuit that " '[t]he Hudson [10] procedural scheme evidently contemplates that challenges to agency fee determinations will be reviewed initially through an arbitration procedure.' " *Id.* at 1522 (quoting *Pilots Against Illegal Dues (PAID) v. Air Line Pilots Ass'n. (ALPA)*, 938 F.2d 1123, 1133 (10th Cir.1991)).[11]

In short, the procedure of offering the Employees the avenue of arbitrating their objections is supported by precedent, even when there is no contract between the parties providing for arbitration. The establishment of this procedures does not constitute arbitrary or outrageous conduct. This procedure, taken alone, does not constitute a breach of MTC's duty of fair representation.

As stated above, *Hudson V* cautions against *micro-management of fee calculations* by courts and of the resultant unrealistic and overwhelming burden this places on the courts. *Id.* 922 F.2d at 1313. The matters

---

10. *Hudson v. Chicago Teachers Union*, 922 F.2d 1306, 1314 (7th Cir.), *cert. denied*, 501 U.S. 1230, 111 S.Ct. 2852, 115 L.Ed.2d 1020 (1991).

11. Further, I have discretion to decide whether to require exhaustion of internal union procedures. *See N.L.R.B.v. Industrial Union of Marine*

*and Shipbuilding Workers*, 391 U.S. 418, 426 and n. 8, 88 S.Ct. 1717, 1722–23 and n. 8, 20 L.Ed.2d 706 (1968). There is no evidence before the Court, relating to the three *Marine Workers* factors, sufficient to convince me against remanding the remaining issues to an impartial arbitrator.

which remain in dispute are better dealt within the confines of arbitration, as provided by the internal MTC procedures.

### (b) Uniformity Requirement

■ While this Court will not currently evaluate the propriety of the dues amounts exacted, I do find it appropriate at this juncture to address the issue of uniformity.

The Employees maintain that the Council's fee calculation violates NLRA §§ 8(1)(a)(3) which states that a union security clause may only require an "employee to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or maintaining membership...." 29 U.S.C. § 158(a)(3). The basis for this charge is that MTC's policy of allowing an employee to become a member of MTC only by joining the affiliated local union with jurisdiction over his or her job results in variations in the dollar amount of fees paid by different classifications of employees. Otero Declaration, ¶¶ 8 & 22. This is because each of the affiliated unions has its own dues structure.

The *Beck* case addresses the uniformity requirement in footnote 8, stating that it:

makes clear that the costs of representational activities must be borne equally by all those who benefit; without this language, unions could conceivably establish different dues rates both among members and between members and nonmembers, and thereby apportion the costs of collective bargaining unevenly.

*Id.* at 753, 108 S.Ct. at 2653.

■ *Klemens v. Air Line Pilots Ass'n, Intern.,* 736 F.2d 491 (9th Cir.1984) involved a situation where pilots were charged union dues based on a certain percentage of salary. The Ninth Circuit relied on *Bagnall v. A.L.P.A.,* 626 F.2d 336 (4th Cir.1980), *cert. denied,* 449 U.S. 1125, 101 S.Ct. 943, 67 L.Ed.2d 112 (1981), which held that union dues based on a percentage of earnings were "uniformly required," noting that the statute prescribes "uniformity," not "equality." *Bagnall* and *Klemens* held, and this Court agrees, that the uniformity requirement was designed to prevent discrimination. Its purpose is not violated if the dues imposed are based on a reasonable non-discriminatory classification. *Klemens* held that it was reasonable for a union to base dues or assessments on ability to pay.

In this instance each union bases it's dues on the union representational activities among those who benefit. The cost of these activities varies from union to union. The Council's local union affiliates chose to engage in coordinated bargaining by forming the MTC, rather than by seeking certification as joint representatives or by becoming individually certified. If each of the unions were certified separately, varying dues rates would be imposed, one union from the next, yet there would be no uniformity violation. By choosing the joint representation route, although "equal" dues rates are not imposed, "uniform" dues rates are imposed to all members and non-members of each union. These constitute fees which are based on a reasonable non-discriminatory classification.

This is also true of the incidental fact that *Beck* objectors received a fee reduction based on both the Council's expenditures and those of the affiliate. If an affiliate has not done the necessary accounting the Council forgives the objector from paying the affiliate's portion of the agency fee. Again, although not equal, this is a uniform, non-discriminatory system for handling these circumstances.

### IV. MOTIONS FOR SUMMARY JUDGMENT BETWEEN SANDIA AND EMPLOYEES

The Employees allege against Sandia that it participated in the fair representation violations incurred by MTC (Complaint, Count II). This Court has held, *infra.,* that under the facts of this case, the MTC has not violated its duty of fair representation. *See* discussion *infra* part III.A.1–3. Logically speaking, because there have been no violations of this duty by MTC, there can be no participation in violations by Sandia.

Further, the Employees allege that Sandia violated express or implied conditions of the Collective Bargaining Agreement (Complaint, Count III). Although all pleadings of the Employees are extremely difficult to understand, I believe the main gist of allegations in this regard is that they were actually

or constructively discharged from employment under an Agency Shop provision which did not fully and accurately advise them of their rights and which exacts amounts that exceed the MTC's costs of collective bargaining. They allege they were discriminated against because they were not members of the MTC.[12]

To the extent that the Employees attempt to indirectly challenge the agency shop provisions, this Court has already held that they are facially valid. *See infra* part III.A.1. Further, this Court has held that the notice provisions were adequate and that the remaining chargeability issues will be resolved by an arbitrator.

The Employees argue that the *Beck* case has transformed what had been labor organization liability into joint labor-organization/employer liability, at least where violations of the duty of fair representation occur under blatantly unlawful provisions, as they contend occurred here. Of course, as noted above, this Court concludes that these provisions are not blatantly unlawful. Furthermore, as was the Court in *Price v. International Union, et al.,* 927 F.2d 88, 94 (2d Cir.1991), this Court is unaware of any authority in support of the contention that an employer may be found to have participated in a breach of the CBA because it has not challenged the post-*Beck* procedures implemented by the union.

■ I turn now to the specific topic of discharge of certain Employees, as this has not been addressed previously in this Memorandum Opinion.

Reduced to its simplest terms, Sandia's basic position is that, in terminating four employees, it was merely fulfilling its obligations under the provisions of its valid contract with the Council. Sandia asserts that it acted in accordance with the provisions of Article 39 of the CBA and thus under the terms of § 8(a)(3) of the Act.

■ Section 158(a)(3) of the NLRA provides:

that no employer shall justify any discrimination against an employee for non-membership in a labor organization ... if he has reasonable grounds for believing that membership was denied or terminated for reasons other than the failure of the employee to tender the periodic dues [fees] uniformly required as a condition of acquiring or retaining membership.

Thus, failure to tender the requisite core dues under a typical union-shop provision carries the sanction of termination. *N.L.R.B. v. General Motors Corporation,* 373 U.S. 734, 83 S.Ct. 1453, 10 L.Ed.2d 670 (1963)(holding that termination is also the appropriate sanction for failure to pay fees under an agency-shop clause). An employer who is bound to a union-security clause negotiated with the 9(a) bargaining representative of its employees will not be deemed to have committed an unfair labor practice if it discharges an employee at the union's request for failure to tender dues and fees owed pursuant to the clause. This immunity is lost pursuant to Section 158(a)(3)(B), if the employer has "reasonable grounds" to believe that the discharge was actually requested for reasons other than the employee's failure to make the requisite dues and initiation fee tender. In determining whether such grounds exist, an employer has a duty of inquiry, "only ... where the employer is aware of ... facts that would lead [it] to believe that the discharge may be for an improper purpose," but that duty is not, however, "exhaustive, and the extent of the duty, if any, will vary from case to case." *H.C. Macaulay Foundry Company v. N.L.R.B.,* 553 F.2d 1198, 1202 (9th Cir.1977), *citing N.L.R.B. v. Zoe Chemical Company,* 406 F.2d 574, 580–83 (2d Cir.1969). No assertion of such awareness of Sandia is made here, nor are there any facts before the Court to raise an issue of fact sufficient to jeopardize the immunity of the employer under Section 158(a)(3). Sandia argues that MTC's request to terminate plaintiffs was premised on their admitted failure to pay their agency fees and that there is no evidence of any other reason for the request.

12. Employees also complain that accurate determinations and explanations of the amount of the reduced fee were not provided to them prior to

threats of or actual or constructive discharges from employment.

Where an employee himself does not deny that his discharge was based on nonpayment of dues, the employer has no obligation to even question the discharge request from the union. *Zoe Chemical Company,* 406 F.2d at 580 n. 11. Furthermore, unless the employer is aware of facts that would lead it to believe that the discharge might be for an improper purpose, the employer has no duty to inquire into the union request for termination. *H.C. Macaulay Foundry Company,* 553 F.2d at 1201–02.

Further, contrary to Employees' arguments, I conclude that *Beck* does not modify the application of Article 39 nor does it support the arguments of the Employees that the employer is equally culpable of unlawful acts. *Beck* speaks to expenditure of funds by the union and not the collection of funds by the employer: "The statutory question presented in this case, then, is whether this "financial core" [of mandatory membership] includes the obligation to support union activities beyond those germane to collective bargaining, contract administration, and grievance adjustment." *Beck,* 487 U.S. at 745, 108 S.Ct. at 2648. Employees make the argument that by using the word "exacting," courts have implied that the employer is equally culpable. It is on this basis that they now claim that in *post-Beck* cases, both the exaction and spending of funds are unlawful. In *Beck,* the only defendant was the union. When discussing the topics of exaction and spending, the Supreme Court was referring to the actions of the defendant union in its exaction and spending, not those of an employer. *Id.* at 751–52, 762–63, 108 S.Ct. at 2651–52, 2657–58.

Furthermore, an employer is not to be held responsible for how agency fees or dues are spent by the union. Such a claim was dismissed in *Reid v. McDonnell Douglas Corp.,* 443 F.2d 408, 412 (10th Cir.1971), where the court noted that "the possible violation of employees' rights is caused by the expenditure [of funds] by the union, not the collection by the company, of dues paid under union security agreements," *citing International Ass'n of Machinists v. Street,* 367 U.S. 740, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961).

 The amount of an agency fee is relevant only to "the union and non-member employees; it is not an aspect of the relationship between the employer and employees...." *North Bay Development Disabilities Services, Inc. v. N.L.R.B.,* 905 F.2d 476, 478 (D.C.Cir.1990), *cert. denied,* 498 U.S. 1082, 111 S.Ct. 952, 112 L.Ed.2d 1041 (1991).

In reaching this conclusion, the Court does not rely on the settlement or mitigation arguments of the parties, which will remain unaddressed in this Opinion.